617 So.2d 305 (1993)
DEPARTMENT OF HEALTH AND REHABILITATIVE SERVICES, etc., Petitioner,
v.
William PRIVETTE, Respondent.
No. 78837.
Supreme Court of Florida.
April 8, 1993.
*306 Joseph R. Boyd and William H. Branch of Boyd & Branch, P.A., Tallahassee, and Chriss Walker, Dept. of Health and Rehabilitative Services, Tallahassee, for petitioner.
Daniel A. David, Sarasota, for respondent.
KOGAN, Justice.
We have for review Privette v. State Department of Health & Rehabilitative Services, 585 So.2d 364 (Fla. 2d DCA 1991), based on express and direct conflict with Pitcairn v. Vowell, 580 So.2d 219 (Fla. 1st DCA 1991). We have jurisdiction. Art. V, § 3(b)(3), Fla. Const.
The Florida Department of Health & Rehabilitative Services (HRS) pursued this action against William Privette on behalf of a woman who alleged that Privette was the father of her daughter.[1] By sworn complaint, the woman alleged that she was unmarried at the time the child was born, *307 that she had had sexual relations with Privette at the time of the child's conception, and that he was the child's natural father.
In actuality, the woman was married to another man at the time of her daughter's birth, although no evidence was developed refuting her contention of marital infidelity during conception. Moreover, when obtaining her daughter's birth certificate, the woman had stated that her husband was the father. The certificate so notes.
Based solely on the complaint, the trial court ordered Privette to undergo a human leukocyte antigen test, a medical procedure that can determine paternity with a high degree of certainty. Privette then petitioned the Second District for common law writ of certiorari. The district court granted the petition, reasoning that Privette's privacy rights and the best interests of the child should have been weighed by the trial court. Privette, 585 So.2d at 366.
It is easy to misperceive cases of this type as concerning little more than men allegedly trying to evade parental obligations. This is a temptation the courts must avoid. In actuality, this is a case about impugning the legitimacy of a child for the sake of money allegedly owed to the State of Florida. And it also is a case about impugning the parental rights of the child's present legal father for the same reason.[2] Sometimes there may be good grounds for doing so. But as a matter of public policy, we cannot agree that the State can risk plunging children into the stigma of illegitimacy and undermining parental rights for no better reason than appears on the present record. A good deal more is required.
We must start from the premise that the presumption of legitimacy is based on the policy of protecting the welfare of the child, i.e., the policy of advancing the best interests of the child. Sacks v. Sacks, 267 So.2d 73 (Fla. 1972). This policy is a guiding principle that must inform every action of the courts in this sensitive legal area.
The present suit was for all practical purposes originated by HRS based on a standard complaint form consisting almost entirely of preprinted fill-in-the-blank boilerplate language signed by the mother. The complaint is not even accurate, because it alleges that the child was "born out of wedlock." There is no indication the mother had any other role in the proceedings or showed any interest in them whatsoever. All she did was sign her name to a document, apparently at HRS's insistence.
Essentially this case has been litigated as though it is about nothing more than repayment of money HRS expended on behalf of the child.
At the trial bench, the parties stipulated to a few sketchy facts, made a few arguments, and a blood test was ordered for reasons the trial court did not make clear. We can only assume the trial court agreed that the test was justified based entirely on HRS's financial interests. There was absolutely no consideration of the child's best interests and no mention of the child's legal father. For all we know, no attempt was made to notify the legal father (i.e., the one listed on the birth certificate) nor was he given the chance to intervene, if he in fact is available and so desires.
While we do not quarrel with HRS's legal authority to pursue paternity cases, such authority does not take precedence over a child's future interests, nor over the sanctity of legally established family relationships about which we know next to nothing on the present record. See Carlson v. State Dept. of Health & Rehab. Servs., 378 So.2d 868 (Fla. 2d DCA 1979).
Once children are born legitimate, they have a right to maintain that status both factually and legally if doing so is in their best interests. Art. I, § 9, Fla. Const. The child's legally recognized father likewise has an unmistakable interest in maintaining the relationship with his child unimpugned, Santosky v. Kramer, 455 U.S. 745, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982); *308 In re D.B., 385 So.2d 83 (Fla. 1980), such that his opposition to the blood test and reasons for so objecting would be relevant evidence in determining the child's best interests.[3]
Thus, before a blood test can be ordered in cases of this type, the trial court is required to hear argument from the parties, including the legal father if he wishes to appear[4] and a guardian ad litem appointed to represent the child.[5]See State in re J.W.F., 799 P.2d 710, 713 (Utah 1990). HRS also may be an appropriate party in cases involving the expenditure of public monies on behalf of the child.
We essentially agree with the test adopted by the district court below with a few refinements. The trial court hearing a petition for a blood test is required: (a) to determine that the complaint is apparently accurate factually, is brought in good faith, and is likely to be supported by reliable evidence,[6] and (b) to find that the child's best interests will be better served even if the blood test later proves the child's factual illegitimacy. The one seeking the test bears the burden of proving these elements by clear and convincing evidence. See Smith v. Department of Health & Rehabilitative Servs., 522 So.2d 956 (Fla. 1st DCA 1988).
While this burden is substantially greater than would apply in any other discovery context, we believe it is absolutely mandated by the presumption of legitimacy and the policies on which it rests. Court after court in the United States has held that the presumption and its related policies are so weighty that they can defeat even the claim of a man proven beyond all doubt to be the biological father. E.g., Michael H. v. Gerald D., 491 U.S. 110, 109 S.Ct. 2333, 105 L.Ed.2d 91 (1989); John M. v. Paula T., 524 Pa. 306, 571 A.2d 1380, cert. denied, 498 U.S. 850, 111 S.Ct. 140, 112 L.Ed.2d 107 (1990); State in re J.W.F., 799 P.2d 710 (Utah 1990); Monroe v. Monroe, 88 Md. App. 132, 594 A.2d 577, cert. granted, 325 Md. 18, 599 A.2d 90 (1991); Foster v. Whitley, 564 So.2d 990 (Ala. Civ. App. 1990); In re Marriage of Klebs, 196 Ill. App.3d 472, 143 Ill.Dec. 363, 554 N.E.2d 298 (1990); In re Marriage of Ross, 13 Kan. App. 2d 402, 772 P.2d 278, aff'd in part & rev'd in part on other grounds, 245 Kan. 591, 783 P.2d 331 (1989); Banta v. Banta, 782 P.2d 946 (Okla. App. 1989); Atkinson v. Atkinson, 160 Mich. App. 601, 408 N.W.2d 516 (1987); Nelson v. Nelson, 10 Ohio App.3d 36, 460 N.E.2d 653 (1983); State ex rel. H. v. P., 90 A.D.2d 434, 457 N.Y.S.2d 488 (1982); see In re Marriage of A., 41 Or. App. 679, 598 P.2d 1258 (1979).
*309 The New York intermediate appellate court in H. v. P. has stated that, while the presumption of legitimacy is rebuttable, it will not fail unless common sense and reason are outraged by applying it to the case at hand. H. v. P., 457 N.Y.S.2d at 491. We take this to mean that there must be a clear and compelling reason based primarily on the child's best interests to overcome the presumption of legitimacy even after the legal father is proven not to be the biological father. This is at least the equivalent of the burden of proof that would exist in proceedings to terminate the legal father's parental rights.[7]See Santosky v. Kramer, 455 U.S. 745, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982). Thus, if a test shows that Respondent is the child's biological father, this fact without more does not constitute grounds to grant a paternity petition.
This conclusion is especially compelling in light of the fact that we must establish a neutral rule applicable to all cases of this type. While there may be some cases where the child has had little contact with the legal father, other cases will be quite the contrary. It is conceivable that a man who has established a loving, caring relationship of some years' duration with his legal child later will prove not to be the biological father. Where this is so, it seldom will be in the children's best interests to wrench them away from their legal fathers and judicially declare that they now must regard strangers as their fathers. The law does not require such cruelty toward children.
All of this has important consequences in deciding whether a blood test will be permitted in the first instance. If the record shows there is no possibility the presumption of legitimacy can be overcome by the blood test result (whatever it might be), then the test will serve no purpose at all. If there is no purpose, the petition should be denied. The child should not risk being stigmatized without reason. Thus, in a real sense, the trial court ordering the blood test must decide one of the ultimate issues: whether the child's best interests will be served by being declared illegitimate and having parental rights transferred to the biological father.
As to the privacy issues, we agree that the State can have a compelling interest in determining paternity in a proper case, and that a blood test can be the least intrusive means of advancing that interest. However, a compelling interest does not come into existence in the abstract but must be based on adequate factual allegations and a record establishing that the test itself is in the child's best interests. Absent that, the State's interest does not reach the threshold of being "compelling": The blood test thus would be an improper intrusion into the putative father's privacy, if he has properly asserted this right.[8] Art. I, § 23, Fla. Const. However, any such privacy claim is merely collateral to the overriding concern in the case: the child's best interests.
It may well be that, had certain facts been better developed below and proper procedures followed, the blood test would have been permissible here. We have few facts before us, but the record at least suggests that the child has been abandoned by the legal father and with its mother is living in poverty. If this state of affairs was properly established, the stigma of illegitimacy might well be outweighed by the child's need for support, especially in *310 light of any abandonment by the legal father.
However, courts cannot guess at facts not properly developed, nor can they grant blood tests merely because HRS wants reimbursement. The failure here to appoint a guardian ad litem for the child, the failure to use proper procedures, and the inadequate record are each fatal to the trial court's order. Accordingly, the trial court's order was improper, and the decision reached by the district court below is approved. We disapprove Pitcairn to the extent it is inconsistent with our views here. This cause is remanded for further proceedings consistent with our opinion.
It is so ordered.
BARKETT, C.J., and OVERTON, McDONALD, SHAW and HARDING, JJ., concur.
GRIMES, J., dissents with an opinion.
GRIMES, Justice, dissenting.
It is ironic that a putative father is seeking to raise the presumption of legitimacy to avoid having to pay support for the child he is alleged to have fathered. As this Court stated in another context:
This presumption ... was created to protect the welfare of the child. To now utilize this same presumption to deny this child support is to destroy the very reason for its existence. The welfare of the child demands that we recognize and honor not the fiction, but the underlying purpose upon which the fiction was created.
Sacks v. Sacks, 267 So.2d 73, 76 (Fla. 1972).
The presumption of legitimacy is grounded upon public policy. However, for purposes of discovery, the legislature has established the public policy of Florida when it enacted section 742.12(1), Florida Statutes (1989), which provides in pertinent part:
In any proceeding to establish paternity in law or in equity, the court on its own motion may or upon request of a party shall require the child, mother, and alleged fathers to submit to Human Leukocyte Antigen tests or other scientific tests that are generally acceptable within the scientific community to show a probability of paternity.
Therefore, the putative father does not have standing in the discovery phase of litigation to raise the presumption of legitimacy in avoidance of the potential ordering of support. Pitcairn v. Vowell, 580 So.2d 219 (Fla. 1st DCA 1991).
Because section 742.12(1) reflects the public policy of requiring HLA testing in paternity actions, the only relevant argument advanced by Privette is his constitutional claim to privacy. However, it is well settled that where the intrusion is justified and the means and procedures respect standards of reasonableness, compulsory blood tests do not violate the federal constitution. Schmerber v. California, 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966). To suggest that Florida's constitutional right to privacy permits a putative father to refuse a blood test in order to avoid the possibility of having to support his child offends ordinary principles of justice.
I do not dispute that at the final hearing the best interests of the child should be of paramount concern, nor do I suggest that the legal father should not have a say in this proceeding. However, at this stage of the litigation where the sufficiency of the complaint has not been challenged, the statute requires the taking of the HLA test, and there are no constitutional infirmities involved. I find it strange that in its effort to promote its own view of public policy, the majority makes it difficult to obtain the one test most likely to reveal the truth.
I respectfully dissent.
NOTES
[1] The state agency essentially is seeking remuneration from the putative natural father for public funds spent on behalf of the child.
[2] Of course the mere fact of a blood test establishing the putative natural father's paternity does not in itself result in a legal declaration of illegitimacy or a legal termination of the legal father's parental rights.
[3] For example, a legal father who is actively participating in the care and custody of his legal child would be entitled to object to the test on grounds that he is satisfied with his status and does not want the child's legitimacy questioned in any way. See Brenda J. Runner, Protecting a Husband's Parental Rights When His Wife Disputes the Presumption of Legitimacy, 28 J.Fam.L. 115 (1989-90). In appropriate cases, parents can be equitably estopped from disputing paternity where they previously have acknowledged the legal father's paternity, e.g. Wade v. Wade, 536 So.2d 1158 (Fla. 1st DCA 1988); Boyles v. Boyles, 95 A.D.2d 95, 466 N.Y.S.2d 762 (1983), or the legal father's paternity could be ruled unassailable based on other equitable principles where the legal father has established a mutually rewarding relationship with the child, he desires to continue exercising parental rights, he is supporting the child to the best of his ability, and maintaining the existing relationship is in the child's best interests. See Marshek v. Marshek, 599 So.2d 175 (Fla. 1st DCA 1992); Atkinson v. Atkinson, 160 Mich. App. 601, 408 N.W.2d 516 (1987). Obviously, the same concerns would not apply where the legal father has abandoned the child or otherwise has acted contrary to the child's best interests.
[4] The legal father must be given notice of the hearing either actually if he is available or constructively if otherwise; and he must be heard if he wishes to argue personally or through counsel.
[5] The child as represented by the guardian ad litem is an indispensable party, since the child's best interests are the primary issue of the proceeding.
[6] In considering this factor, the trial court should take into account inconsistent statements made by the mother. Inconsistent statements about paternity may not always defeat a complaint, but they certainly cast doubt on its good faith. On the other hand, the complainant could overcome these doubts by showing legitimate and believable reasons for the inconsistent statements. As noted above, inconsistent statements made by the mother could constitute an estoppel as to any claim she might bring, in an appropriate case.
[7] We essentially are dealing with a species of termination proceeding when the petition will have the effect of vesting parental rights in the putative natural father and removing parental rights from the legal father. We do not see how a court constitutionally could apply a standard less than that recognized in Santosky v. Kramer, 455 U.S. 745, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982), and other applicable case law where this is true.
[8] It may be true that the putative father lacks standing to assert the child's presumption of legitimacy, but this means little. By asserting a privacy interest the putative father necessarily puts in issue the child's best interests, which substantially implicates the presumption. If the child's best interests require maintaining the presumption, then the presumption will prevail because the State will lack a compelling interest justifying the blood test. Art. I, §§ 9, 23, Fla. Const.