756 So.2d 125 (2000)
FLORIDA DEPARTMENT OF REVENUE ex rel. R.A.E., Appellant,
v.
M.L.S., Appellee.
No. 2D98-3902.
District Court of Appeal of Florida, Second District.
February 18, 2000.
Rehearing Denied April 12, 2000.
Robert A. Butterworth, Attorney General, Tallahassee, and Jon J. Johnson, Assistant Attorney General, Tampa, for Appellant.
Thomas A. Smith, Tampa, for Appellee.
*126 THREADGILL, Judge.
The Department of Revenue (DOR), on behalf of the natural mother of a thirteen-year-old child, appeals an order that sets aside a final order of child support and an order modifying child support. The order on appeal was entered after the putative father, the appellee, filed a motion to set aside the order of support based on a DNA paternity report that excluded him as being the child's father. DOR argues that the final order of support was res judicata on the issue of paternity and that the appellee was not entitled to challenge it eleven years after it was entered. We affirm.
Evidence in this meager record reveals that the parties had a sexual relationship during the time of the child's conception, but were never married. The child was born in June of 1986. Later that year, the Department of Health and Rehabilitative Services filed a petition for child support on behalf of the mother against the appellee. The petition alleged that the appellee was a legally responsible parent, as defined by chapter 409, Florida Statutes (Supp.1982), that he signed the minor child's birth certificate, and that the child was born as a consequence of the appellee's relationship with the child's mother.
In June of 1987, after a hearing, the trial court entered a final order requiring the appellee to pay child support. There is no indication in the record, however, that the issue of paternity was challenged or otherwise litigated at that hearing. Although the order of support states, "the defendant shall pay the sum of $40.00 per bi-weekly for the support of his minor child," the trial court specifically held in the order now on appeal that the child support order was entered "without a finding of paternity." For the next ten years, the appellee paid child support and had weekend contacts with the child.
In June of 1998, the appellee filed his motion to set aside the final order of child support. At the hearing on that motion, the appellee testified that he thought he was the child's father until November of 1997, when the child told him that he was not her real father and asked who her real father was. In May of 1998, as soon as he could afford the cost, the appellee took the child for the blood test, which excluded him as the father. The report of this test was presented to the trial court. At the conclusion of the hearing, the trial court set aside the final order of support and the order modifying support.
With regard to the issue of res judicata, a party claiming the benefit of a former adjudication has the burden of establishing, with sufficient certainty, by the record or by extrinsic evidence, that the matter was formerly adjudicated. See Wisconsin ex rel. North v. Martorella, 670 So.2d 1161 (Fla. 4th DCA 1996). A judgment establishing paternity should not be entered solely on unadmitted and unproven allegations of paternity, but on the basis of competent, substantial evidence. See id. at 1162. Here, as in North, absent factual or legal conclusions in the prior order, there is no indication paternity was ever adjudicated. See id. Thus, because the issue of paternity was not previously litigated and no finding of paternity was previously made, the child support orders were not res judicata and did not bar the appellee's challenge.
Further, DOR argued in the trial court that, by signing an acknowledgment on the back of the child's birth certificate stating he was the father, the appellee acknowledged paternity. The appellee testified, however, that he did not remember signing the birth certificate, and the certificate was not otherwise verified. Regardless, the appellee's signature on the back of the birth certificate did not have the effect of establishing paternity. Under the current version of the Florida Statutes, a voluntary acknowledgment of paternity creates a rebuttable presumption of paternity. See § 742.10(1), Fla. Stat. (1999). At the time of the execution of the birth certificate in this case, however, no such *127 provision existed. See, e.g., §§ 742.011-742.11, Fla. Stat. (1985).
Citing Florida Rule of Civil Procedure 1.540, DOR also argues that the appellee's challenge to the final order of child support was untimely. Rule 1.540 states that relief based on mistake, newly discovered evidence, or intrinsic fraud may not be sought more than one year after the final order is entered. The trial court here, however, determined that it was no longer equitable for the order to have prospective application. According to the rule, relief based on equitable grounds may be sought within a reasonable time. Here, the appellee raised his challenge within a reasonable time after being told by the child that he was not her real father.
Our paramount consideration in paternity cases is the best interests of the child. See Benac v. Bree, 590 So.2d 536 (Fla. 2d DCA 1991); Marshall v. Marshall, 386 So.2d 11 (Fla. 5th DCA 1980). We are aware that the best interests of children generally would be served by finality and stability in matters involving paternity. In this case, however, the issue of paternity was never formally adjudicated. The child has been illegitimate since birth, and it was eventually determined that the appellee is not the child's father. The Florida Supreme Court has stated, "`a person has no legal duty to provide support for a minor child who is neither his natural nor his adopted child and for whose care and support he has not contracted.'" Daniel v. Daniel, 695 So.2d 1253, 1254 (Fla.1997) (quoting Albert v. Albert, 415 So.2d 818, 820 (Fla. 2d DCA 1982)). The court also noted that such a rule could properly be applied in Daniel because it did not threaten the child's legitimacy. Id. at 1255; see also Department of Health & Rehabilitative Servs. v. Privette, 617 So.2d 305, 307 (Fla.1993)(once child is born legitimate, she has right to maintain status both factually and legally if doing so is in her best interest). In this case, the child was not legitimate, and the appellee's claim in no way affected her status in that regard. Further, at the hearing on the motion to set aside the orders of child support, both the appellee and the child's mother testified that the appellee no longer maintains a relationship with the child. Thus, we are unable to conclude that the child's best interest would be better served by receiving child support from a party who is not her father than by learning the identity of her father. If the appellee is no longer required to pay support, DOR and the child's mother will have an incentive to locate the child's father, and perhaps the child will have the opportunity to develop a meaningful relationship with him.
Accordingly, we affirm the order setting aside the final order of child support and order modifying child support. We certify the following question to the Florida Supreme Court as a matter of great public importance:
WHETHER AN INDIVIDUAL, WHO HAS BEEN TOLD HE IS THE FATHER OF A CHILD BORN OUT OF WEDLOCK, WHO SIGNED THE CHILD'S BIRTH CERTIFICATE, WHO NEVER MARRIED THE CHILD'S MOTHER, AND WHO HAS BEEN PAYING CHILD SUPPORT PURSUANT TO A COURT ORDER THAT MADE NO FINDING OF PATERNITY, MAY DENY PATERNITY MANY YEARS AFTER SAID COURT ORDER WAS ENTERED, IF HE LEARNS THROUGH GENETIC TESTING THAT HE IS NOT THE BIOLOGICAL FATHER?
Affirmed.
PATTERSON, C.J., Concurs.
ALTENBERND, J., dissents with opinion.
ALTENBERND, Judge, Dissenting.
I realize that the majority feels compelled to make this decision due to the holding in Daniel v. Daniel, 695 So.2d *128 1253 (Fla.1997). Although I concur in the decision to certify a question to the supreme court in this case, I must dissent as to the outcome. M.L.S. acknowledged his status as the legal father of I.S. many years ago. He should be estopped to deny his obligations as legal father. This is particularly true when his allegations do not identify a putative biological father to whom the courts might shift his status as legal father.
Even if M.L.S. were not estopped to challenge his status as legal father, I believe that he has neither alleged a proper basis nor presented evidence sufficient to terminate his status as the legal father of this thirteen-year-old child. This child has lost her right to have a support father in a proceeding in which she did not testify and in which she had no separate representation. To the extent that this outcome appears to hinge exclusively upon her status as an "illegitimate" or nonmarital child, I believe the outcome raises serious concerns about equal protection.
Because of the emergence of accurate DNA testing, our common law system, which provides only "presumptive" fathers, is no longer able to fulfill the needs of children. In an era when a significant percentage of children are born to parents outside the bonds of traditional marriage, both marital and nonmarital children need established legal fathers upon whom they can rely for care and support. Although it may be preferable to select the biological father as the legal father in most cases, the simple truth is thatfor many generations the presumption of legitimacy gave many children legal fathers who were not their biological fathers.
In 1992, the legislature enacted a statute that makes a voluntary acknowledgment of paternity on a birth certificate a legal determination of "paternity." See § 742.10, Fla. Stat. (Supp.1992); ch. 92-138, § 28, Laws of Fla. This statute effectively establishes permanent legal fathers for children born after 1992 under circumstances comparable to this case. I believe that the courts should now use estoppel to give permanent legal fathers to nonmarital children born prior to 1992 because we provide comparable protection for marital and quasi-marital children.

I. THE RECORD
I agree with the majority that the record in this case is "meager." The evidentiary hearing was about an hour in length and contains only the testimony of M.L.S. and the mother, R.A.E. From this record, it is clear that I.S. was born in a hospital on June 8, 1986. Prior to the child's birth, M.L.S. and R.A.E. lived together in a nonmarital relationship. M.L.S. was at the hospital when the child was born. On the birth certificate prepared at the hospital, I.S. was given M.L.S.'s surname and M.L.S. is named as her father. The certificate includes his social security number. On the back of the certificate is an acknowledgment of paternity containing his witnessed signature. At no time has M.L.S. alleged that his signature on the acknowledgment is a forgery. He merely testified at the hearing that he did not remember signing the document a dozen years earlier and could not now identify his signature.[1] The mother testified that he signed the certificate.
For the first six months after the child's birth, M.L.S. lived with the child and the mother. After he left, he continued to see the child almost every weekend for eleven years. Thus, from this limited record, his relationship with the child appears similar to that of any divorced father who is not the custodial parent.
With the help of the Department of Health and Rehabilitative Services, R.A.E. filed a petition for support near the end of 1986. The petition alleged that M.L.S. was a "legally responsible parent as defined by Chapter 409," and that he "signed *129 the birth certificate for the minor child,... said child having been born as a consequence of his relationship with [R.A.E.]." A copy of the birth certificate was attached to this pleading. In 1986, a "responsible parent" for purposes of chapter 409 was "the natural or adoptive parent of a dependent child, ..." § 409.2554(5), Fla. Stat. (1985).
Our record contains no answer to this pleading nor any transcript of a hearing. The final judgment of support, entered on June 30, 1987, by Judge Vernon W. Evans, Jr., reflects that a hearing took place on June 11, 1987. M.L.S. recalled attending the hearing and he did not ask for any genetic testing at that time.[2] The final order provides that he "shall pay the sum of $40.00 per bi-weekly [sic] for the support of his minor child, to wit: [I.S.] born June 8, 1986." M.L.S. did not appeal this order. M.L.S. did not provide either the trial court in 1998, nor this court today, any admissible proof that Judge Evans' untranscribed or unreported hearing was not a lawful "adjudicatory hearing" establishing paternity. See § 742.10, Fla. Stat. (Supp.1986). Nevertheless, it is likely that the determination was made upon the consent and agreement of M.L.S. At a minimum, that hearing established a rebuttable presumption of paternity in 1987. See § 742.10, Fla. Stat. (Supp.1986).
A decade later, the Department of Revenue filed a supplemental petition for modification on behalf of R.A.E. to increase the $40 biweekly support. The petition was served on M.L.S. in March 1998. He responded with a letter stating that the child had asked him who her biological father was. He stated: "I wish to have a blood test taken, even though it has been at least eleven years." The Department sent a request for admission to M.L.S. in mid-April, asking that he admit that he owed a duty of support. He did not respond to the request. A final hearing on the issue of modification was set before a hearing officer for June 1, 1998.
M.L.S. appeared for the hearing. There is no transcript of this hearing in the record, but the hearing officer entered an order containing findings. The order does not discuss M.L.S.'s desire for a blood test, but recommends that support be increased to $193 every two weeks. The trial court entered a judgment on the hearing officer's order on July 1, 1998.
Meanwhile, M.L.S. retained an attorney who filed a motion on June 19, 1998, to set aside the 1987 final order and to reconsider any ruling emanating from the June 1, 1998, hearing. This motion attached a photocopy of the results from a DNA paternity test apparently taken on May 22, 1998. The report claimed that M.L.S. and I.S. had been tested, and that M.L.S. was excluded as her biological father. The motion contended, without further factual elaboration, that the final judgment can be set aside due to "a mistake or fraud perpetrated on this Court by the Petitioner." The Department moved to dismiss this motion as untimely and improper.
A hearing was held on these motions on August 26, 1998. A transcript of this hearing is in the record. After brief discussion, the trial court decided to hear the motion for relief from judgment. M.L.S. testified that R.A.E. had always told him that I.S. was his daughter, and he had always assumed the same. He claimed that he had a conversation in November 1997 with I.S. in which she suggested that she was not his biological child.
*130 M.L.S. apparently decided to have testing performed when he had the money. He asked R.A.E., as the child's custodial parent, whether he could have the test performed. He testified that she refused to have anyone "stick a needle" in her "baby's" arm. Despite this refusal for testing by the child's mother, as her legal guardian, M.L.S. allegedly took I.S. to a diagnostic lab and obtained an unauthorized test.[3] The test results include no information verifying the identity of the persons tested, such as fingerprints or photographs, and no foundation was made for their admissibility. Nevertheless, the results of this test were admitted into evidence without objection.[4]
R.A.E. testified under oath that she had not had a relationship with another man. She simply claimed that the DNA test must be wrong. Thus, the majority's notion that this teenage girl is now free to discover the existence of her "real" father in order to have a "meaningful relationship" with him is perhaps a bit optimistic.
Even if one assumes that R.A.E. had a relationship with another man at the time of conception in 1985, M.L.S. provided no evidence that R.A.E. did not believe in good faith that he was the biological father of this child. He never denied having engaged in relations that could have resulted in the child's conception. He did not identify any putative biological father.
Without hearing from the girl or appointing a guardian ad litem, the trial judge recognized that the evidence before him presented several possible explanations: First, the biological child of this couple was switched at birth in the hospital. Cf. Mays v. Twigg, 543 So.2d 241 (Fla. 2d DCA 1989) (parentage dispute concerning switched baby). Second, R.A.E. was not telling the truth and that she had had a relationship with an unidentified man who was the actual biological father. Third, M.L.S. had obtained inaccurate DNA test results. Fourth, M.L.S. had taken some other child to the testing representing that child to be I.S.
Because M.L.S. had been the "legal father"[5] of I.S. for more than a decade at the time of this hearing, one would expect that he had the burden to prove his motion by clear and convincing evidence.[6] Nevertheless, the trial court required no proof to dispose of the three options that would not support M.L.S.'s motion and seemingly placed the burden on the mother to disprove the DNA results.
*131 The trial court ultimately decided that there was evidence of "deceit" by R.A.E. only because the results of the DNA test contradicted her testimony. Although the motion to set aside the judgment did not allege that the judgment should be set aside as "no longer equitable" under Florida Rule of Civil Procedure 1.540(b)(5) and only claimed fraud and mistake, the trial court decided to set the 1987 judgment aside on grounds that it was no longer equitable to enforce it. Thus, the court terminated child support effective June 25, 1998. The written order also grants relief under rule 1.540(b)(4) on the grounds that the 1987 judgment was "void" because it was obtained by deceit or mutual mistake.

II. ISSUES OF DISAGREEMENT
I disagree with the result in this case for many reasons. Admittedly, some of these reasons have not been preserved for review. Given the importance of this case in an era when a substantial percentage of all children are nonmarital children, I will highlight all of my concerns.
First, I believe the "Final Order of Support" entered in 1987 prevented M.L.S. from denying paternity based upon the principle of res judicata. See Department of Health & Rehabilitative Servs. v. Chambers, 472 So.2d 1358 (Fla. 2d DCA 1985) (acknowledgment of paternity and order of support resolved paternity and prevented relitigation of issue six years later). Although this order does not contain a written finding that M.L.S. is the "natural" father of the child, support could not have been required of him otherwise. See § 409.2654, .2554(5), Fla. Stat. (1985). If there was a dispute as to paternity, M.L.S. was compelled to litigate that issue in 1987. Cf. Johnson v. Johnson, 395 So.2d 640 (Fla. 2d DCA 1981) (requiring husband to raise any doubts as to paternity of child born during marriage during dissolution proceedings). See also ICC Chem. Corp. v. Freeman, 640 So.2d 92 (Fla. 3d DCA 1994) (holding res judicata applies not only to matters actually raised and determined, but also to those which properly could have been raised and determined).
Second, I believe the motion for relief from judgment should have been dismissed or denied as insufficient. Deceit and mutual mistake are simply not bases for relief under rule 1.540(b)(4)-which is limited to "void" judgments. Generally, a void judgment is one entered without jurisdiction or without proper notice. See Auto-Owners Ins. Co. v. Cannella, 737 So.2d 1129 (Fla. 2d DCA 1999); Greisel v. Gregg, 733 So.2d 1119 (Fla. 5th DCA 1999). There is no allegation or evidence which would support a finding that the order of support was void. Mistake is a basis for relief in rule 1.540(b)(1) and fraud is contained in subsection (b)(3). Both of those provisions, however, require that the judgment be challenged within a year. Thus, this motion was untimely on its face concerning the grounds actually alleged in the motion.
I do not believe that the motion alleged a basis for relief under rule 1.540(b)(5).[7] Even if it did, the "no longer equitable" ground in that rule should not permit a judge to deprive this child of a support father and leave her with little or no hope of ever tracking down a biological father to sue for paternity. M.L.S.'s own delay and acquiescence in this whole matter has allowed I.S. to have a father/daughter relationship with him for years. I fail to see the equity in depriving this teenager a paternal support under the circumstances of this case, when M.L.S. was given a *132 chance in 1986 to contest his status as legal father.
Third, even if the motion stated a claim for relief from judgment, the facts in this case demonstrate estoppel. M.L.S. went to the hospital for the delivery and acted like any other father for at least six months after I.S. was born. He acknowledged paternity on the birth certificate. He acquiesced in a support judgment that obviously is based on an allegation that he is the biological father. He could have filed a simple answer in 1987 denying that he was the biological father of the child. Instead, he elected, for whatever reason, to accept responsibility for this child. The legislature has already created a statutory basis for estoppel under similar circumstances for those birth certificates signed after 1992. See § 742.10, Fla. Stat. (1992). The courts should close the remaining window that apparently exists involving children born outside marriage prior to that year.
The court's failure to protect I.S.'s interest in having a support father under these circumstances raises equal protection concerns. This court has held that the legal fathers of quasi-marital children are estopped from denying paternity under similar circumstances.[8]See C.C.A. v. J.M.A., 744 So.2d 515 (Fla. 2d DCA 1999); White v. White, 710 So.2d 208 (Fla. 1st DCA 1998). Quasi-marital children's rights to support are protected by virtue of the presumption of legitimacy. See Privette, 617 So.2d 305.[9] I.S. would be entitled to support from the father listed on her birth certificate if she were a quasi-marital child, but she receives no support in this case because she is a nonmarital or "illegitimate" child. There is no rational basis for the law to discriminate against I.S. simply because her mother was unmarried at the time of her birth. To do so in this case appears to be a violation of equal protection principles. See U.S. Const. amend. XIV, § 1; Shelley v. Kraemer, 334 U.S. 1, 68 S.Ct. 836, 92 L.Ed. 1161 (1948) (finding equal protection principles apply to actions of state courts). It is not this child's fault if her DNA does not match that of the man who is identified as her legal father in the acknowledgment on her birth certificate and in the 1987 judgment. She did nothing to delay or hinder any search for some other potential candidate for the role of legal father. We should give her the same right to protect her claim to a legal father that we would give to a child of a marriage.
Fourth, even Daniel, 695 So.2d 1253, recognizes that a man may contract to care for and support a child. Both by acknowledging paternity on the birth certificate and by acquiescing in the judgment of support, M.L.S. agreed or contracted to care for this child. He received the child's love and affection and contact for at least eleven years in exchange. He should not be permitted to breach the promise he made to this child many years ago.
Finally, even if M.L.S. had a viable legal theory to advance in his motion for relief from judgment, he should carry a heavy burden of proof to dispossess I.S. of any legal father to whom she can look for *133 support. If the concept of the presumption of legitimacy addressed in Privette establishes a marital or quasi-marital child's right to a supporting father, I.S. has an equally established right to a supporting father through her birth certificate and the 1987 judgment. Perhaps the obligations of her legal father might be shifted at this time to another man by clear and convincing evidence, but I see no public policy promoted by allowing this child to lose her rights in the manner in which they were lost in this case.
At a minimum, I.S. was entitled to the assistance of a guardian ad litem. The mother and DOR did not raise the defense of laches or other defenses the child might prudently raise. Even if the mother misled M.L.S., the child should have her own laches defense because M.L.S.'s actions, or lack thereof, have resulted in an eleven-year delay of any effort to locate a new father with whom to have a meaningful relationship. See City of Eustis v. Firster, 113 So.2d 260 (Fla. 2d DCA 1959).
I would reverse and remand for reinstatement of the support order and instruct the court to conclude the issues presented in the petition for modification.
NOTES
[1] No one contests that the official birth certificate in the record is not prima facie evidence of the facts stated therein. See § 382.35(5), Fla. Stat. (1985).
[2] Although at the time of I.S.'s birth section 742.011, Florida Statutes (1985), only permitted a mother to initiate a paternity action, the supreme court had held that a father could establish paternity through a declaratory judgment action. See Kendrick v. Everheart, 390 So.2d 53 (Fla.1980). In addition, section 742.011 was amended effective October 1, 1986, to allow a putative father to file a petition to establish paternity. See § 742.011, Fla. Stat. (Supp.1986); ch. 86-220, § 150, Laws of Fla. Thus, if M.L.S. was in doubt and wanted a resolution of the issue of paternity outside the support action, he was entitled to file an action under chapter 742.
[3] At the time of his request, the law specified that the mother of a nonmarital child is its natural guardian and is entitled to primary care and custody unless a court enters an order to the contrary. See § 744.301, Fla. Stat. (1997). Our record contains nothing suggesting that M.L.S. ever obtained custodial authority for I.S.
[4] I have previously questioned whether the courts should permit allegations about or evidence of DNA tests that are obtained without legal authorization. Chris W. Altenbernd, Quasi-Marital Children, 26 FSU Law Review 219, 266 (Winter 1999). I am inclined to believe that the photocopy of the DNA test in this record should not have been admitted into evidence. At a minimum, the trial court should have conducted a hearing to determine whether a court-authorized test was appropriate before considering the results. Cf. Department of Health & Rehabilitative Servs. v. Privette, 617 So.2d 305 (Fla.1993) (requiring appointment of a guardian ad litem and "best interest" hearing prior to authorizing paternity test when child's legitimacy is at stake).
[5] The supreme court defined "legal father," at least for a marital or quasi-marital child, as the man whose name appears on the birth certificate. See Privette, 617 So.2d at 307. The legislature effectively established a comparable definition of legal father for nonmarital children in 1992 in section 742.10 when an acknowledgment on a birth certificate became a determination of paternity. See § 742.10, Fla. Stat. (Supp.1992); ch. 92-138, § 28, Laws of Fla.
[6] Cf. Privette, 617 So.2d at 309 (Fla.1993) (holding person seeking blood test has burden to prove basis by clear and convincing evidence; and even with blood test requiring "clear and compelling reason" based primarily upon child's best interests to overcome presumption of legitimacy).
[7] There is little case law on this provision. Nonetheless, in State, Department of Health & Rehabilitative Services v. Wright, 498 So.2d 1008 (Fla. 2d DCA 1986), we denied a husband's request to set aside a final judgment of dissolution of marriage that ordered him to pay child support when he claimed, for the first time, that he was not the child's biological father. We reasoned that Florida Rule of Civil Procedure 1.540(b)(5) contemplates equities which arose after a final judgment rather than those which would have been defenses to the action.
[8] Quasi-marital children are children born to a married woman when the biological father is not the husband. See Chris W. Altenbernd, Quasi-Marital Children, 26 FSU Law Review 219, 220 (Winter 1999). The husband of the mother is the presumptive "legal father." See Privette, 617 So.2d at 307; § 382.16(5)(a), Fla. Stat. (1985).
[9] Privette suggested that legitimacy is a very important right of children, stating that children had a right to maintain legitimacy if it was in their best interests. See Privette, 617 So.2d at 307 (citing art. I, § 9, Fla. Const.). Daniel v. Daniel, 695 So.2d 1253 (Fla.1997), however, seems to render this right largely illusory. Daniel leaves a child with "legitimacy" on the face of the birth certificate but the "legitimate father" has no obligation to support the child nor a right to visitation. Thus the constitutional right discussed in Privette appears to be a right of paper legitimacy only. I am convinced that I no longer understand the role of "legitimacy" in determining legal parentage of children born to married women.