776 So.2d 1118 (2001)
Javier FERNANDEZ, Appellant,
v.
Michael Scott McKENNEY, et al., Appellee.
No. 5D99-1476.
District Court of Appeal of Florida, Fifth District.
February 9, 2001.
Barbara Nolte of Giles & Robinson, P.A., Orlando, for Appellant.
Jerri A. Blair of Jerri A. Blair, P.A., Tavares, for Appellee.
THOMPSON, C.J.
Javier Fernandez appeals a final summary judgment ruling that Michael McKenney is the natural and legal father of two children conceived and born when Fernandez was married to Patricia McKenney, the mother of the children. We reverse and remand for further proceedings.
In ruling on a motion for summary judgment, the trial court must view the evidence in the light most favorable to the non-moving party, and must draw every reasonable inference in favor of the party against whom the motion is made. Destiny Const. Co. v. Martin K. Eby Const., 662 So.2d 388 (Fla. 5th DCA 1995). Read in the light most favorable to Fernandez, the record shows that through her acts of deception, Patricia McKenney was able to maintain relationships with both Fernandez *1119 and Michael McKenney during her marriage to Fernandez. Patricia McKenney deceived Fernandez into thinking the children were his biological children, and Michael McKenney not only acquiesced in the deception, he actively assisted in it.
Approximately a year after the birth of the second child, Patricia McKenney decided she wanted a divorce. She and Fernandez entered a settlement agreement. The stipulated final judgment stated that there were two children born of the marriage. It ordered Fernandez to pay child support and awarded him visitation. A reasonable view of the record is that Patricia McKenney continued to deceive Fernandez well after the divorce, and led him to believe that a reconciliation might be possible. Further, reading the record in the light most favorable to Fernandez, his visitation with the children became less and less frequent, not because of a lack of interest on his part, but because he was inconvenient to Patricia McKenney. Similarly, the record supports the inference that Fernandez, aware that their joint checking account was still available to Patricia McKenney, stopped giving Patricia McKenney child support checks at her behest when she explained that the business she acquired as a result of the dissolution was doing so well she no longer needed the checks.
In contrast to the above view of the record, the final judgment, which suffers the deficiency of overreaching that often obtains when counsel draft final judgments, erroneously fails to read the record in the light most favorable to the moving party, and renders factual determinations regarding contested matters. Based on Department of Health & Rehabilitative Services v. Privette, 617 So.2d 305 (Fla. 1993) and Daniel v. Daniel, 695 So.2d 1253 (Fla.1997), we conclude that this matter must be remanded for a determination of whether there is a clear and compelling reason why the children's best interests would be served by overcoming the presumption that Fernandez is their father. Although the summary judgment to an extent purports to be based on a best interests determination, because it is a summary judgment there are no legitimate findings of fact in it. Further, there is practically nothing in the record about the relationship between Michael McKenney and the children. All that is shown is that he was apparently willing to trick Fernandez into thinking that the children were his, and to allow some kind of a bond to develop between his biological children and Fernandez. Accordingly, the summary judgment is reversed for a determination of the best interests of the children based on the actual facts. On remand the court shall appoint a guardian ad litem.
REVERSED and REMANDED.
GRIFFIN, J., concurs.
SHARP, W., J., concurs specially with opinion.
SHARP, W., J., concurring specially.
I agree that the trial court erred in this case by not holding an evidentiary hearing and making findings of fact supported by competent substantial evidence that the declaration of Michael McKenney's paternity of these two children would be in their best interests, as suggested in Dept. of Health and Rehabilitative Services v. Privette, 617 So.2d 305 (Fla.1993). However, I have sympathy for trial judges in such cases, because the "law" is not clear. As Judge Alternbernd has cogently observed, the advent of genetically accurate testing for paternity has partially "broken the back" of the common law presumption of legitimacy for children born while a mother and her husband are married. Courts have failed to deal consistently with how and when the common law presumption of legitimacy (i.e., that the husband is the father of the child) can be challenged, and what determinations a court must make to allow the challenge and its aftermath.
This case involves unique circumstances. The children can be described as "quasimarital children" of either type two or *1120 type three, as set out by Judge Altenbernd in his article,[1] since they were conceived and born during the time Javier Fernandez and Patricia McKenney were married, but (depending on the testimony believed by the finder of fact) after the parties were separated. Based on testimony, Javier and Patricia did not live together except for the first few months of their marriage in Miami. After they moved to Central Florida, she lived separate from him: sometimes with her mother, or on her own, or with Michael McKenney, although she visited Javier at his various residences from time to time.
Javier and Patricia were divorced in 1993, and Patricia married Michael McKenney shortly thereafter. Although Javier was named as the children's father and required to pay child support in the dissolution proceedings, for one reason or another, he has not consistently done so, and although he was given reasonable visitation rights, they have not been consistently exercised. Although there is controverted testimony to some degree, the two children have little or no relationship with Javier. Michael and Patricia have lived as an intact family since before 1993 and earlier, and the only "father" relationship the girls have is with Michael. Patricia and Michael have had a third child born to them since their marriage.
In 1997, Javier discovered that Patricia had married Michael. This led to a discussion concerning her prior relationship with Michael and the actual paternity of the children. They agreed to have a DNA test performed and the results established that Michael was the biological father of both children. Javier accepted the results, but insisted on his visitation rights, which the children apparently resisted. Thus, the ground work for this paternity suit by Michael was laid. Patricia is also named as a defendant in this lawsuit, together with Javier, although she is aligned with Michael. Patricia hired an attorney to represent the children.
In Dept. of Health and Rehabilitative Services v. Privette, 617 So.2d 305 (Fla. 1993), the Florida Supreme Court addressed paternity and support issues in the context of a quasi-marital child (one born to a married woman, but possibly fathered by another man).[2] The court was greatly concerned about impugning the "legitimacy" of a child, and destroying the parental rights of a "legal father," unless there were good grounds to do so. It upheld the presumption of legitimacy (paternity by the legal father) as valid public policy, based on the goal of protecting the welfare of the child. In that case the issue was whether the trial court should initially order HLA tests. It remanded the cause to the trial court for a hearing and determination of whether it was in the child's best interest to establish its actual paternity by a man not married to the mother, and whether to allow the legal father to participate in the proceedings.
Going far beyond the facts in that case, the court surmised that the person seeking such a remedy had to establish clear and compelling reasons to overcome the presumption of legitimacy; i.e., that the legal father is the biological father. Biology alone would not be sufficient. In Privette, the court said the record indicated the legal father had abandoned the child, and the mother was living in poverty. Thus in remanding the case, the court suggested such grounds could be established. It stressed that the over-riding concern should be this child's best interests.
In G.F.C. v. S.G. 686 So.2d 1382 (Fla. 5th DCA 1997), this court ruled against a man claiming to be the biological father of a child born to an intact marriage, in a case in which he petitioned to establish his *1121 paternity. Unlike the facts in the case at hand, the mother and the legal father were living together at the time of conception, at the birth of the child, and thereafter, and the legal father had at all times acknowledged the child as his own, and established a close relationship with the child. Also in contrast with this case, the biological father in G.F.C. had not established any kind of a relationship with the child. In that case we ruled that under those facts, the biological father had no cause of action under the paternity statute. See also Johnson v. Ruby, 771 So.2d 1275 (Fla. 4th DCA 2000).
In G.F.C. we also said that a man claiming to be the biological father of a child born to an intact marriage, may have a right to bring a suit for adjudication of paternity under the due process clause of our state Constitution, if he has established a relationship with the child, and the legal father has been remiss in fulfilling his role as a father.[3] We said such a claim should only be recognized where compelling reasons are alleged and established to justify the transfer of parental status from one man to the other, grounded generally on findings concerning the child's best interest.
It appears this may be such a case. As noted above, the record indicates Patricia and Javier experienced very little of a true marriage, and that she and the children spent more time with Michael and her mother than with Javier during their marriage. It also appears Javier has not played the role of a true father to the children, by living with them in an intact family situation and supporting themalthough he may have been willing to do so. And it seems Michael has fulfilled that role for these children since at least 1993, if not from the time of their birth.[4] He also has married their mother, thereby creating an intact family unit, for the past six years, in which the children are happy and content.
The DNA tests have been done and all parties agree that Michael is the children's biological father. However, whether the next step of changing the status of the legal father from Javier to Michael should be taken,[5] should be determined by the court after a full evidentiary hearing. And, I agree that a guardian ad litem should be appointed to assist in that determination. See Harris v. Harris, 753 So.2d 774 (Fla. 5th DCA 2000). The petitioner, Michael McKenny must establish this best interest finding by clear and convincing evidence. Privette.
Unfortunately, Privette did not address how or what factors to consider in making this determination. See Kimberly G. Montanari, Note, Does the Presumption of Legitimacy Actually Protect the Best Interests of the Child? 24 Stetson L.Rev. 809 (1995). In this law review article, the author suggests the following inquiries are relevant in deciding such a case:
1) With whom has the child resided?
2) Has either the legal father or the putative father established a father/child relationship or any other type of relationship with the child?
3) Does the legal father wish to exercise or continue to exercise his parental rights?

*1122 4) Has the mother been living with either the legal father or the putative father?
5) For what length of time has the present custody arrangement been in effect?
6) Does the child have siblings who were conceived with either the legal father or the putative father?
7) Who does the child consider to be his or her father?
8) What name is listed on the child's birth certificate?
9) What last name does the child use?
10) Has the mother maintained inconsistent positions regarding the child's paternity?
11) Does the legal father, putative father, or the mother object to submitting to a HLA test and if so, on what grounds? (Not applicable in this case).
12) What is the legal father's and the putative father's level of willingness and ability to provide for the child's emotional and intellectual development?
13) What is the legal father's and the putative father's level of emotional, mental, and physical fitness?
14) Has the legal father or putative father abandoned or abused the child or the child's mother?
15) Has the legal father or putative father ever acted contrary to the child's best interests?
16) Has the child's mother or legal father filed a dissolution proceeding?
17) Has the legal father or putative father provided any type of support for the child?
18) Does the legal father or putative father have the financial ability to pay child support?
24 Stetson L.Rev. at 838-840.
Courts in other states dealing with this issue, as well as the issue of whether to allow the DNA blood test in the first instance, have adopted the best interest of the child test.[6] Some have suggested a number of specific factors to consider. In Ban v. Quigley, 168 Ariz. 196, 812 P.2d 1014 (App.1990), rev. denied, 169 Ariz. 477, 820 P.2d 643 (Ariz.991), the court said the trial court should consider the strength of the emotional bonds between the putative father and the child, the putative father's ability and actual supplying of economic support for the child, the actual custody of the child, the extent of the putative father's personal commitment to the child, and the consistency of his interest in the child. In Matter of Paternity of Adam, 273 Mont. 351, 903 P.2d 207 (1995), cert. denied, 517 U.S. 1156, 116 S.Ct. 1544, 134 L.Ed.2d 647 (1996), the court stressed as important factors to be considered the stability and importance of the family unit to the child which would be affected by the paternity determination, the emotional attachments of the child, and all potential benefits and detriments to the child. See also McDaniels v. Carlson, 108 Wash.2d 299, 738 P.2d 254, 261 (1987). But one court opted to leave the matter of determining the best interest of the child entirely to the trial court's discretion. N.A.H. v. S.L.S., 9 P.3d 354 (Colo.2000).
In essence, the general public policy appears to be to protect a stable, intact family unit (if there is one) from disruption by a putative father. In In re Paternity of C.A.S., 161 Wis.2d 1015, 468 N.W.2d 719 (1991), the court stressed that the existence and nature of the putative father's *1123 relationship with the child is the prime requisite to allowing a putative father to establish his paternity and thus legal fatherhood of a child born to a woman who is married to another man. The court stated:
[I]f a putative father of a child born to the wife of another man has not established an actual relationship with that child, he does not have a constitutional protected interest in establishing his parentage of the child, or in a relationship with that child.
468 N.W.2d at 725-726. In that case there was a strong family relationship between the legal father and the children, and the court concluded that "nothing good could come out of this family structure by the adjudication of paternity."
The facts in this case, however, appear opposite to those in the cases cited above. Here there is no intact stable family unit headed by the legal father to protect. The family unit that exists in this case is headed by the biological father who has also established strong bonds with the children. Thus it is an appropriate case for resolution below, based on the children's best interests. This is an issue which is entirely separate and apart from the best interests of Michael, Patricia or Javier.
NOTES
[1] Chris W. Altenbernd, Quasi-Marital Children: The Common Law's Failure in Privette and Daniel Calls for Statutory Reform, 26 Fla. St. U.L.Rev. (1999).
[2] Chris W. Altenbernd, Quasi-Marital Children: The Common Law's Failure in Privette and Daniel Calls for Statutory Reform, 26 Fla. St. U.L.Rev. (1999).
[3] See also Whitney v. Hall, 434 So.2d 40 (Fla. 1st DCA 1983). In addition, McKenney may also have a federal constitutional right to establish and protect his parental rights. See Stanley v. Illinois, 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972).
[4] Although Javier's name is on the older child's birth certificate, Michael's name is on the birth certificate of the younger. But, a father's signature on the back of a birth certificate has been held not to establish paternity. Dept. of Revenue v. M.L.S., 756 So.2d 125 (Fla. 2d DCA 2000).
[5] A child can have only one legal father under our present law, and that determination will resolve which man will enjoy the rights and responsibilities of fatherhood: right to parent the child, right to direct the child's activities, right to make decisions about the child, rights of custody and visitation, etc.
[6] See In re Paternity of B.J.H., 573 N.W.2d 99 (Minn.Ct.App.1998); Matter of Paternity of Adam, 273 Mont. 351, 903 P.2d 207, 209 (1995), cert. denied, 517 U.S. 1156, 116 S.Ct. 1544, 134 L.Ed.2d 647 (1996); In re Paternity of C.A.S., 161 Wis.2d 1015, 468 N.W.2d 719 (Wis.991); Ban v. Quigley, 168 Ariz. 196, 812 P.2d 1014 (App.1990), rev. dismissed, 169 Ariz. 477, 820 P.2d 643 (1991); M.F. v. N.H., 252 N.J.Super. 420, 599 A.2d 1297 (1991); C.C. v. A.B., 406 Mass. 679, 550 N.E.2d 365 (1990); McDaniels v. Carlson, 108 Wash.2d 299, 738 P.2d 254 (1987).