DISTRICT COURT OF APPEAL OF THE STATE OF FLORIDA
FOURTH DISTRICT

**A.D.A.,** the mother and
**M.J.L.,** the father,
Appellants,

v.

**D.M.F.,** the husband,
Appellee.

Nos. 4D15-575 and 4D15-874

[June 8, 2016]

Consolidated appeals from the Circuit Court for the Fifteenth Judicial Circuit, Palm Beach County; Howard H. Harrison Senior Judge; L.T. Case Nos. 2010-DR-000186-XXXX-NB and 2013-DR-011152-XXXX-NB.

A.D.A., the mother, Royal Palm Beach, pro se.

M.J.L., the father, Royal Palm Beach, pro se.

Andrew A. Harris of Burlington & Rockenbach, P.A., West Palm Beach, and J. Mark Maynor of Maynor & Associates, West Palm Beach for appellee.

GROSS, J.

This unusual case challenges the ability of the law to do the right thing. Under applicable Florida Statutes, we reverse the order of the circuit court denying a motion for paternity testing filed by a man who seeks to establish himself as the biological father of a child. To decide this case against the rights of the biological father would be to condone an attempt to sidestep the adoption statute.

There are three actors in this case—the child's mother (A.D.A.), the mother's husband (D.M.F.), and the mother's former boyfriend (M.J.L.).

The mother and boyfriend had a romantic relationship that ended in late 2009, because she was "in trouble with the law." On December 22, 2009, the mother had a baby girl; she listed no father on the birth certificate. There was the "requisite sexual contact" between the mother

and the boyfriend to make it a "reasonable possibility" that the boyfriend was the baby's father. § 742.12(2), Fla. Stat. (2014). Although not yet married to the mother, the husband was present at the child's birth; the boyfriend also came to the hospital the day of the birth.

In January 2010, the boyfriend filed a petition to determine paternity and related relief. The petition alleged that the boyfriend and the mother had an intimate relationship during a time frame consistent with his paternity, but that the mother would not let him see the child. The boyfriend's affidavit stated he had no income and $50 in assets.

On February 19, 2010, the boyfriend filed a claim of paternity with the Florida Putative Father Registry. According to section 63.054(1), Florida Statutes (2010), one legal effect of this filing was that it "preserve[d] the [boyfriend's] right to notice and consent to an adoption" under Chapter 63, Florida Statutes.

The boyfriend filed a voluntary dismissal of his paternity action in July 2010.

On July 29, 2010, the mother and husband filed an Acknowledgment of Paternity affidavit, listing the husband as the "natural father" of the child. As described in section 742.10(1), Florida Statutes (2010), this Acknowledgement was a "notarized voluntary acknowledgment of paternity." In pertinent part, the "Acknowledgement by Natural Parents" stated:

> Under penalties of perjury, **WE HEREBY DECLARE** that we have read the foregoing Acknowledgement of Paternity and that the facts stated in it are true, that is, that the mother was unwed at the time of birth, that no other man is listed on the birth record as father, that we are the natural parents of the child named above and that we fully understand our responsibilities and rights printed on the reverse side of this form . . . We understand that a person who knowingly makes a false declaration pursuant to s. 92.525(2) or 382.026(1), Florida Statutes is guilty of perjury by false written declaration, a felony of the third degree . . . .

In no uncertain terms, the reverse side of the form explained that by executing the acknowledgement, the parties to it were swearing that "they are the natural parents" of the child and that the father was "agreeing that [he was] the biological father of the child." The form warned: "Do not sign the ACKNOWLEDGEMENT OF PATERNITY if you are not certain you are the child's father." The form cautioned that once the form was executed, "paternity can only be challenged by proving in court that [the father's]

signature on the [Acknowledgement] was obtained through fraud, under duress, or that there was a material mistake in fact."

The mother and husband were married on August 2, 2010. They separated in July 2011, when the mother left the marital residence.

The husband filed for dissolution of marriage on October 24, 2013. His petition alleged that a minor child was "born of the marriage of the parties" and requested 50/50 timesharing and a parenting plan. Little did he know, trouble was brewing—the mother had filed a complaint with the Department of Children and Families about the husband's behavior with the child; the husband said the allegations were false. The allegations remained pending throughout this litigation.

In November 2013, the boyfriend refiled a paternity petition. In that case, the mother and boyfriend, now apparently reconciled, filed a joint motion for scientific testing to determine parentage; both acknowledged the possibility that the boyfriend was the baby's father, but they were uncertain. The boyfriend was incarcerated at the time the motion was filed.

A circuit judge granted the motion for paternity testing, observing that the mother was not married to another at the time of the child's conception or birth. The paternity test results were filed with the court a month later. The test determined that the boyfriend could not be excluded as the baby's father and the probability of paternity was 99.9999%. The mother and the boyfriend filed an agreed parenting plan.

The husband moved to set aside the paternity testing, claiming that he was the child's legal father and the paternity suit was refiled without notice to him. He also moved to consolidate the paternity case with the divorce action. The circuit judge granted both of the husband's motions, consolidating the cases and striking the DNA results, which were declared null and void. A *Privette*[1] evidentiary hearing was set prior to the scheduled final hearing on paternity.

As required for a *Privette* hearing, the circuit court appointed a guardian ad litem ("GAL") for the child in the paternity action. The GAL's report concluded that it was in the child's best interest to have the DNA testing done to determine paternity. Relevant to this conclusion was the prior testing, which had confirmed the boyfriend as the child's father. The report stated that initially, the child had bonded with the husband and had called him "Daddy"; by the time of the report, the husband had not had recent contact with the child due to the mother's abuse allegations.

[1]*Dep't of Health & Rehab. Servs. v. Privette*, 617 So. 2d 305 (Fla. 1993).

The mother had rekindled her relationship with the boyfriend and had been taking the child to visit him in prison. As a result, the child now called the boyfriend "Daddy."

With candor, the report noted that none of the parties had "shown the capacity to routinely and consistently make good judgments about themselves or others, so as to give the GAL confidence that the decision as to the DNA testing, whichever way it went, would result in a stable, safe, and healthy life for the child." Under these circumstances, the GAL "opted for the truth," finding the child had the right to know the truth about her parentage. The reintroduction of the husband into the child's life "could at this point do more harm than good" and there was no hope of a positive and healthy relationship between the husband and mother "upon which to build a foundation for family stability."

At the January 2015 *Privette* hearing, the boyfriend appeared by phone from prison; the boyfriend, mother, and the GAL were aligned together against the husband and his family. We briefly summarize the testimony as to each side.

The boyfriend asserted he had supported the mother during the first eight months of her pregnancy. For three months after the birth, the boyfriend testified he made child support payments, which the mother did not deny. After he moved to Brevard County for a better job, the mother frustrated his access to the child by cutting off contact with him for two years. He did not see the child from 2010 to 2012. After the boyfriend and mother revived their relationship, the mother brought the child to the prison for visits and the child and the boyfriend had bonded. After release from prison, the boyfriend and mother planned to live together in a place where he had lined up a good job.

The GAL's testimony expanded on the findings in her report. She conceded that the husband loved the child and had been held out as the father during the first three years of the child's life and it was the mother's conduct and her allegations of abuse that had prevented the husband from seeing the child.

The husband pointed to the boyfriend's 15-20 prior arrests, with his current incarceration being his fourth time in prison, to question the boyfriend's stability. In contrast, the husband had a steady job at which he earned a good salary. The husband's father and stepmother testified that the husband had been a "doting father" who brought the child to many family gatherings. Until the divorce proceedings, neither had known that the husband was not the child's biological father.

The husband did not take the position that he could have been the biological father of the child. He did not testify that he and the mother had intercourse at a time that would have made his paternity a possibility. According to his testimony, the husband came into the child's life in 2009 when the mother was already "giantly pregnant" and in a lot of trouble. After the mother was arrested and jailed, the husband posted her bail and was present at the hospital when the child was born.

Some months later, the husband joined with the mother in filing the Acknowledgement of Paternity and the two married and lived together for a year. During that time, he provided significant financial support and bonded with the child, who called him "Daddy." He attended doctor's visits and paid for Montessori school. The mother's conduct and her false abuse allegations had kept him from the child since September 17, 2013.

After the hearing, the judge denied the motion for paternity testing, concluding that it was not in the child's best interests, which is the standard for a *Privette* hearing. The court ordered the husband and the mother to "immediately begin reunification counselling so that the child and [the husband] can begin to re-establish their father-daughter relationship."

### *Discussion*

We approach this case by looking first to Chapter 742, Florida Statutes (2014), entitled "Determination of Parentage." In July 2010, the mother and the husband filed an Acknowledgement of Paternity. Section 742.10(1) provides that, for a child born out of wedlock, where two parties file a "voluntary acknowledgement of paternity," such "acknowledgement constitutes the establishment of paternity for purposes of this chapter." The acknowledgement creates a "rebuttable presumption" of paternity, subject to the right of "any signatory to rescind the acknowledgement within 60 days after the date the acknowledgement was signed or the date of an administrative or judicial proceeding relating to the child, . . . whichever is earlier." *Id.*

The problem with applying the section 742.10(1) presumption is that the Acknowledgment of Paternity was fraudulent. Both the mother and the husband knew the husband could not have been the biological father when they signed that document. A presumption of paternity cannot rest on a false affidavit.

Similarly, the marriage of the husband and mother did not vest any rights in the husband. Section 742.091 provides that if the "mother of any child born out of wedlock and the *reputed* father shall at any time after its birth intermarry, the child shall in all respects be deemed and held to be

- 5 -

the child of the husband and wife, as though born within wedlock." § 742.091, Fla. Stat. (2014) (emphasis added). The term "reputed father," as used in section 742.091, "can be interpreted to mean the individual generally or widely believed or considered to be the biological father of a particular child." *A.S. v. S.F.*, 4 So. 3d 774, 776 (Fla. 5th DCA 2009). At the time of the marriage in this case, both the mother and the husband knew he could not have been the child's biological father, so he could not be the "reputed" father within the meaning of the statute.

The boyfriend's filing with the Florida Putative Father Registry preserved his rights to notice and consent to an adoption. To give the fraudulent filing of the Acknowledgement, coupled with the marriage, the legal effect of conferring paternity status on the husband would allow a bypass of the entire Chapter 63 adoption process.

Because section 742.091 does not apply, the child is not "deemed" to be the child of the husband, "as though born within wedlock." Contrary to what the trial judge believed, this case is not controlled by *Department of Health and Rehabilitative Services v. Privette*, 617 So. 2d 305 (Fla. 1993). *See also Daniel v. Daniel*, 695 So. 2d 1253, 1255 (Fla. 1997) (limiting *Privette* to "those instances where a child faces the threat of being declared illegitimate, and the 'legal father' also faces the threat of losing parental rights which he seeks to maintain"). *Privette* concerned the legitimacy of a child born *into* a marriage; the case recognized that a "child's legally recognized father . . . has an unmistakable interest in maintaining the relationship with his child unimpugned." *Privette*, 617 So. 2d at 307 (citing *Santosky v. Kramer*, 455 U.S. 745 (1982)). The test fashioned in *Privette* does not apply here, because it was undisputed that the mother was unmarried when the child was born. Thus, the requirements imposed by the trial court—that the boyfriend seeking a paternity test prove by "clear and convincing evidence" that "the child's best interests will be better served" by the test—were incorrect.

In this case, the boyfriend demonstrated more than a "reasonable possibility of the requisite sexual contact" with the mother to justify a paternity test. § 742.12(2), Fla. Stat. (2014). Further, he rebutted the presumption of paternity created by the husband's filing of the Acknowledgement of Paternity by demonstrating it was false. On remand, the court shall accept the results of the paternity test previously conducted.

We distinguish this case from *J.A.I. v. B.R.*, 160 So. 3d 473 (Fla. 2d DCA 2015). In that case, a man filed an Acknowledgement of Paternity pursuant to section 742.10(1), apparently with a good faith belief that it was possible he was the father of a child born out of wedlock. *Id.* at 74.

Based on such a good faith filing of the Acknowledgment, plus the marriage of the man and the mother prior to the filing of a second man's paternity action, the second district concluded that the second man was precluded from challenging the paternity of a child. *Id.* at 475. A good faith filing of the Acknowledgement is absent in this case.

We understand that the trial judge was well-intentioned in his conclusions that the husband and his family had the best interest of the child at heart, contrary to the poor choices demonstrated by the mother's conduct. However, the applicable statutes do not authorize the elimination of the rights of the biological father under the circumstances of this case. We agree with the observation of the second district that difficult cases such as this one "present major public policy issues that are difficult, if not impossible, to address within the case law method." *Dept. of Revenue ex. rel Preston v. Cummings*, 871 So. 2d 1055, 1061 (Fla. 2d DCA 2004), *approved*, 930 So. 2d 604 (Fla. 2006). Unfortunately, the mother in this case has placed her child in a difficult situation beyond the ability of a court to ameliorate.

*Reversed and remanded for further proceedings consistent with this opinion.*

DAMOORGIAN and KLINGENSMITH, JJ., concur.

\* \* \*

***Not final until disposition of timely filed motion for rehearing.***