639 So.2d 639 (1994)
In re E.F., J.E.F., Jr., and X.T.D.W., Children.
A.D., Appellant,
v.
DEPARTMENT OF HEALTH AND REHABILITATIVE SERVICES, Appellee.
No. 93-00647.
District Court of Appeal of Florida, Second District.
July 1, 1994.
*640 Terry Clifton Christian, Tampa, for appellant.
Nancy B. Silva, Tampa, for appellee.
ALTENBERND, Judge.
The mother, A.D., appeals the trial court's order terminating her parental rights to two of her four children. In a perfect world, we would honor the mother's untimely and unperfected request that her children receive the aid of a guardian ad litem during such a proceeding. Although both the legislature and the supreme court have mandated the use of guardians ad litem in parental termination proceedings, our state has never implemented a program to provide an adequate supply of guardians. The program is primarily staffed by volunteers. At a time when the supply of volunteers is exceeded by the demands of children who would benefit from guardians, we cannot hold that a trial court commits fundamental error if it attempts, but is unable, to locate a volunteer guardian ad litem.
When a volunteer is unavailable, the trial court, in considering the best interests of the children, must rely on the methods used before the advent of the guardian ad litem program. Even if we were to conclude that the failure to appoint a guardian ad litem were error in this case, it appears that the error would be harmless. A guardian ad litem might have eased and speeded the children's trip through foster care, but it is highly unlikely that the guardian would have prevented this termination.
The facts in this case are far from unique. On the face of a cold record, these facts contain few emotions. The pleadings are repetitious and the standardized forms numb the reader's mind. But this is the story of three children who, for all practical purposes, were born into foster care and are now fast approaching their teenage years in that same system. We have every reason to hope that their foster parents have given these children good homes and much love. But we will never know with absolute certainty whether these children would have reached a point of stability much earlier, either with their mother or with new, adoptive parents, if they had received help from a guardian ad litem.
We relate the facts of this case in hopes that others will consider these children's experience in deciding whether steps should be taken to increase the supply of volunteer guardians, to prioritize the use of existing guardians, or to fund a limited supply of professional guardians ad litem.

I. TEN YEARS IN FOSTER CARE
A.D. gave birth to three children between August 1981 and May 1984. Two of the children share the same father; the youngest of these three children has another father. Apparently, a fourth child was born after 1984, but is not involved in these proceedings. The three children were first ordered into foster care on October 29, 1984, following their mother's incarceration. At that time, the children were 3 years, 15 months, and 5 months old. They were released to the custody of their aunt on November 5, 1984. On February 6, 1985, the children were again ordered detained because A.D. was incarcerated on charges of aggravated battery. Two days later, they were released to their mother. On February 14, 1985, however, the Department of Health and Rehabilitative Services (HRS) filed a petition for dependency on the basis of this aggravated battery, alleging that it had occurred in the presence of the children. Another detention petition was filed in March 1985, alleging that the mother had been ordered out of her boyfriend's house because she was on drugs and the children had been taken to a relative's house. Because the relative was unwilling to provide for them, the children were ordered into shelter on March 20, 1985.
As a result of these developments, the trial court appointed a guardian ad litem on April 9, 1985. Shortly thereafter, the trial court appointed an attorney to represent the mother. The children were declared dependent on May 23, 1985, when they were ages 3 1/2, 2, *641 and 1. They were released into their mother's custody, under the supervision of HRS, conditioned upon her attending a parenting class, seeking appropriate housing and drug counseling, and keeping HRS informed of the family's residence. A few days later, the guardian ad litem was discharged with no objection from anyone involved in the case.
Four months later, on September 20, 1985, HRS filed another detention petition for the children on the basis that both their mother and aunt had been incarcerated, and their grandmother could not adequately care for them because she lived in a rooming house. They were placed in foster care in October 1985. For all practical purposes, this is the last time the children ever lived with their mother.
In October 1985, the trial court entered an order euphemistically entitled "Order Approving Permanent Placement Plan," which explained that the whereabouts of the two fathers were unknown and that the mother could not enter into a permanent placement plan because she was incarcerated.
A.D. visited the HRS office in early December 1985 after she had been released from jail. She explained that she had been placed on community control for two years and probation for one year. However, on January 7, 1986, the mother was arrested for armed robbery, and thereafter sentenced to one year and one day imprisonment. The children were returned to foster care.
In August 1986, the children were temporarily placed in the custody of a paternal aunt. Two months later, the youngest child, X.W., was removed from her custody and placed in foster care. The aunt had been unable to obtain necessary medical care for X.W. because this child was not her brother's child and, thus, she was not a legal relative.
A subsequent predispositional report filed September 28, 1992, reveals that on November 19, 1986, the mother was given a performance agreement for X.W. that expired in May 1987. She failed to comply with the requirements that she remain free from violations of the law and maintain suitable housing. She did find employment during that period and maintained contact with HRS until January 1987. In December 1986, she had a two-week visitation with X.W. But she was back in jail by March 1987.
In April 1987, E.F. and J.F., who had stayed with their aunt after X.W. was taken to a foster home, were also taken from the aunt's custody on the basis of neglect and placed in foster care. This was the last time that any of these children resided with a relative.
The mother entered into another performance agreement for the three children in June 1987. She maintained employment until October 1987, but failed to provide HRS with a substance abuse evaluation, and on Christmas Eve 1987 was again in jail. She entered into a third performance agreement, but failed to substantially comply with its terms. Her whereabouts were unknown from January to March 1988. She was once again found in prison, where she apparently remained for the 4 1/2 years prior to the termination hearing.
The years of 1989 and 1990 passed with the children in foster care and no significant progress for their permanent placement, either with their mother or elsewhere.[1] A judicial review social study in April 1991 observed that these children were in need of a guardian ad litem. By this time, the three children were ages 9, 7, and 6. The oldest child was experiencing emotional problems, and the review suggested that this child should be placed in a "structured therapeutic residential setting." The trial court entered another order continuing the children in foster care. The record indicates no action on the suggestion that a guardian ad litem be appointed.
In September 1991, a judicial review social study again indicated a need for a guardian. As a result, the trial court entered an order in October 1991 authorizing the program coordinator for the Hillsborough County Guardian Ad Litem Program to designate a guardian. By this time, the youngest child, *642 who had left the mother as a baby, was nearly 7 1/2 years old and had lived with the same foster care family for four years.
By April 1992, no guardian had filed an appearance in the case, and the Guardian Ad Litem Program moved for discharge, explaining that it was mandated to request discharge if it was unable to assign a guardian within seven days. See Standard 4.1 of the Minimal Standards of Operation for the State of Florida Guardian Ad Litem Program, Supreme Court Administrative Order (Feb. 18, 1985). The trial court entered an order, without any objection in the record, discharging the program from further responsibility. This action appears to be the last effort to appoint a guardian for the three children.
HRS filed the petition for termination of parental rights on April 20, 1992, when the three children were approximately 10, 9, and 8. The trial court again appointed counsel to represent the mother. A lengthy evidentiary hearing was held in September. In December 1992, the trial court entered an order continuing the children in foster care pending completion of the termination proceeding. On January 21, 1993, the court entered an order terminating A.D.'s parental rights to the two younger children. The oldest child, then 11 years old, was in a home for emotionally disturbed children. The trial court decided that termination of A.D.'s parental rights was not in that child's best interests.
A.D. appealed the order of termination to this court in January 1993. The mother's attorney experienced difficulties obtaining a complete transcript from the court reporter. That attorney diligently pursued the problem, but the appeal was still delayed several months before an initial brief was filed in November 1993. Briefing was finished in February 1994, and this court scheduled the case for expedited disposition. In all, it will be nearly ten years from the first detention proceeding until the issuance of mandate in this appeal.

II. THE CLEAR AND CONVINCING PROOF OF ABANDONMENT
The mother argues that HRS failed to prove an adequate case of abandonment. One of her points on appeal merits comment, but not reversal. She maintains that her incarceration is not a basis to terminate parental rights. She relies primarily on Williams v. Department of Health and Rehabilitative Services, 589 So.2d 359 (Fla. 5th DCA 1991). That case is distinguishable. A.D. was not incarcerated on a single occasion. She returned to prison repeatedly. One of the performance agreements given to A.D. was specially designed for an incarcerated parent. A.D. failed to complete that agreement, in part, because she assaulted prison guards and was placed in more restrained surroundings. It may be that HRS could have given greater assistance to A.D. over the eight years of dependency, but her own conduct clearly and convincingly established abandonment of the two younger children for purposes of section 39.464(5), Florida Statutes (1991). This case is similar to In re R., Children, 591 So.2d 1130 (Fla. 4th DCA 1992), in which parental rights were terminated after four years of ongoing drug problems, frequent incarcerations, and failure to fully perform any of several performance agreements.

III. THE MANDATED, VOLUNTARY GUARDIAN AD LITEM
For the first time on appeal, the mother argues that the trial court committed fundamental error by failing to appoint a guardian ad litem for the children. The trial court, of course, did appoint a guardian early in the dependency proceedings, and attempted to appoint a guardian at the beginning of the termination proceedings.[2] Although the trial court might have acted earlier to appoint a second guardian, it clearly made a good faith attempt to comply with the law.
The mother's argument that a guardian ad litem is a fundamental requirement in a termination proceeding is supported by several sources. First, for more than a generation, section 415.508(1), Florida Statutes, has provided that the court "shall" appoint a guardian ad litem "at the earliest possible time to represent the child in any child abuse or *643 neglect judicial proceeding." Since 1987, section 39.465(2), Florida Statutes, has required the court to "appoint a guardian ad litem to represent the child in any termination of parental rights proceeding" and to "ascertain at each stage of the proceedings whether a guardian ad litem has been appointed." These statutes have been fully implemented by the supreme court in Florida Rule of Juvenile Procedure 8.215(b), which provides that "[t]he court shall appoint a guardian ad litem to represent the child in any proceeding as required by law and shall ascertain at each stage of the proceeding whether a guardian ad litem has been appointed." (Emphasis supplied.) Moreover, the standard judicial review social study report implicitly moves the court to appoint a guardian when one is needed. On the face of the statutes and the rules of procedure, there is no question that a guardian ad litem is an intended essential safeguard in such a termination proceeding.
We are also aware that Florida and other states have held that a child is an indispensable party in a paternity action and must be represented by a guardian ad litem in such a case. Department of Health and Rehabilitative Servs. v. Privette, 617 So.2d 305 (Fla. 1993); In re H.J.F., 634 N.E.2d 551 (Ind. App. 5 Dist. 1994). This court has applied Privette retroactively to appeals where the error had not been raised in the trial court. Gingola v. Department of Health and Rehabilitative Servs., 634 So.2d 1110 (Fla. 2d DCA 1994). The role of HRS and the court is different in a parental termination proceeding than in a paternity action, but the proceedings do have similarities.
Finally, we are aware that a few states have treated the omission of a guardian ad litem in a termination proceeding as a fundamental error. New Mexico declared that a judgment in a termination proceeding had "no binding effect" because a guardian was not appointed to represent the child. In re Doe, 101 N.M. 30, 677 P.2d 643 (N.M.Ct.App. 1984). Texas has held that the failure to appoint a guardian for a child, at least under the circumstances of a particular termination proceeding, was fundamental error. Nichols v. Nichols, 803 S.W.2d 484 (Tex. Ct. App. 1991). See also Turner v. Lutz, 654 S.W.2d 57 (Tex. Ct. App. 1983) (in termination proceeding, failure to appoint guardian may be raised for the first time on appeal); Arnold v. Caillier, 628 S.W.2d 468 (Tex. Ct. App. 1981) (issue may be raised for first time on appeal); In re M.M., 230 Neb. 388, 431 N.W.2d 611 (Neb. 1988) (failure to appoint guardian ad litem for incompetent parent in termination proceeding is "plain error"); In re T.M.H., 613 P.2d 468 (Okla. 1980) (as a matter of policy, child must have independent representation in termination proceeding). Cf. In re Dayley, 112 Idaho 522, 554, 733 P.2d 743, 775 (1987) (Bistline, J., dissenting) (dissenting from discretionary policy concerning separate representation of children in termination proceeding).
Despite these arguments, we are persuaded that the omission of a guardian ad litem in this termination proceeding does not rise to the level of fundamental error. We have considered that guardians ad litem are a relatively new addition to proceedings involving children. As a matter of due process, such a party was not involved in terminations, let alone indispensable to those proceedings, even a few years ago in Florida. Some states still operate without the benefit of a guardian ad litem program. Others make the appointment of a guardian ad litem a discretionary issue for the trial judge.[3]
Traditionally, it has been the duty of the court to protect the best interests of children involved in all types of litigation. See 43 C.J.S. Infants § 220 (1978). In this termination proceeding, the trial court fulfilled that duty. The children's interests were also considered by HRS. Additionally, the children *644 had foster parents who could protect them to some degree. Although a guardian ad litem would have been a very helpful safeguard in this process, we are not convinced that the omission of a guardian strikes at the foundation of this case. See Sanford v. Rubin, 237 So.2d 134 (Fla. 1970).
We have also considered our supreme court's decision expressly holding that children are not entitled to legal representation in dependency proceedings as a matter of constitutional right, in part, because they have a statutory right to a guardian ad litem. In re D.B., 385 So.2d 83 (Fla. 1980). We do not interpret D.B. to imply a constitutional due process right to a guardian ad litem. Admittedly, it is troubling when children have neither legal representation nor a guardian in a proceeding designed to permanently sever their ties to their natural parents. It is entirely reasonable to suggest that children should be entitled to an attorney whenever the statutorily mandated guardian is unavailable. Nevertheless, such alternative representation should be established statewide on a prospective basis either by the legislature or the supreme court, not as a form of relief in this case by this court.
Finally, we have also considered the nature and structure of the guardian ad litem program. This program evolved from studies promoted by the federal Child Abuse Prevention and Treatment Act of 1974. 42 U.S.C. § 5106a (1988).[4] Our legislature and supreme court cooperated in a pilot project in the early 1980s to determine the best method to establish a guardian ad litem program. After considering the use of public defenders or other paid professionals, Florida opted for a program of volunteer guardians, as a cost-effective method to deliver the needed protection. This program was implemented by the supreme court in an unpublished administrative order dated February 18, 1985. See generally, Ellen I. Hoffenberg, For The Sake Of Our Children: Selected Legislative Needs Of Florida's Children, 8 Nova L.J. 223 (Winter 1984); Sarah B. Herald, Volunteer Child Advocates  Guardians Ad Litem, 59 Fla. B.J. 57 (Dec. 1985).
As a volunteer project, there is no question that this program has been very successful. Lawyers and laypersons alike have willingly volunteered long hours for training and participation in the program. It has been such a good program that the courts and the legislature have expanded its use to a wide array of litigation contexts, as pressures on our traditional family structure have increased the need for such advocates.
Throughout Florida, the increasing demands of children who need guardians ad litem now chronically overwhelm the supply of volunteers. See Jane H. Shaeffer, Representation of Children in Dependency Actions, 66 Fla. B.J. 64 (Nov. 1992); Nancy Schleifer, Making Law: Advocates for Children, 64 Fla. B.J. 28 (Mar. 1990). Almost 40% of dependency cases filed in Florida during fiscal 1990-91 could not be supplied with volunteer guardians, despite the statute mandating their use. See Annual Report of G.A.L., 1990-1991.[5]
We cannot reverse a trial judge who uses his or her own judgment to determine the best interests of a child when the judge has requested and not received a voluntary guardian ad litem.[6] Prior to the supreme court's administrative order, both this court and the Fifth District suggested that the primary responsibility for the Guardian Ad Litem Program rested with HRS. In re *645 M.P., 453 So.2d 85 (Fla. 5th DCA 1984), review denied, 472 So.2d 732 (Fla. 1985); In re R.W., 409 So.2d 1069 (Fla. 2d DCA 1981), review denied, 418 So.2d 1279 (Fla. 1982). Even if the supply of guardians has become, in part, a judicial function, we cannot delay or deny a child the right to be placed in a suitable permanent home merely because a volunteer is unavailable.[7] Were the legislature to fund a limited program of professional guardians ad litem, we might have the luxury of reaching an opposite result.
Assuming it was error for the trial court to grant the motion of the guardian ad litem program for discharge and to proceed without a guardian, we are not persuaded that the error was harmful to A.D. We do not question her standing, as the natural mother, to raise this issue on behalf of her children, but the evidence in this case establishes her repeated, long-term inability to develop necessary parenting skills. Even considering the limitations resulting from imprisonment, there is essentially no evidence that A.D. has attempted to communicate with the younger children for many years. Certainly, a guardian could have helped to speed this process over the last decade, but we see no evidence that faster proceedings would have reached any result other than termination concerning the two younger children.
We hesitate to extend these proceedings for yet another year. On the other hand, the unfulfilled mandate for guardians ad litem in termination proceedings creates an important issue with potential constitutional ramifications. It is possible that the supreme court may disagree with our analysis. If the supreme court were later to hold that a judgment of termination was not binding in the absence of the mandated guardian, this result could affect many adoptions. At a minimum, the supreme court could use this case to prioritize usage of guardians under its administrative rules or to require legal representation of children who have no guardian. Accordingly, we certify the following question as a matter of great public importance:
WHETHER A TRIAL COURT COMMITS FUNDAMENTAL ERROR IF IT FAILS TO APPOINT A GUARDIAN AD LITEM IN A PARENTAL TERMINATION PROCEEDING AS REQUIRED BY SECTION 39.465(2), FLORIDA STATUTES.
Affirmed.
DANAHY, A.C.J., and QUINCE, J., concur.
NOTES
[1] The legislature "intends" that "no child remain in foster care for more than 1 year." § 39.45(2), Fla. Stat. (1993). This case demonstrates the wide disparity that frequently exists between the announced legislative intent and the actual funded program.
[2] Over the years, more than one judge presided in this division.
[3] See Ind. Code § 31-6-11-9 (1993) (under child abuse chapter, the court may appoint a guardian or a court-appointed special advocate); Tex.Family Code Ann. § 11.10 (West 1994) (in parental termination, court shall appoint guardian ad litem unless the child is a petitioner, an attorney has been appointed for the child, or the child's interests have been adequately protected); Me. Rev. Stat. Ann. tit. 19, § 533-A (West 1993) (in parental rights termination proceedings, the court may appoint a guardian ad litem for the child); Wash. Rev. Code Ann. § 13.34.100 (West 1993) (in dependency and parental termination cases, court shall appoint a guardian ad litem, unless the court for good cause finds the appointment unnecessary).
[4] It appears that the Florida Legislature enacted the statute mandating guardians, section 415.508, in order to qualify for federal funds. See Child Abuse and Neglect Prevention and Treatment, 45 C.F.R. § 1340.14 (1990). Having accepted the federal funds, Florida would seem to have at least a greater moral responsibility to fulfill its own mandate.
[5] The 1990-91 annual report of the Guardian Ad Litem Program represents the most recent data on the supply of guardians in dependency cases.
[6] It is noteworthy that at least one state has given the judge the power to appoint other persons as guardian when a volunteer is unavailable. In dependency and parental termination cases, the Washington Code acknowledges the possibility that the demand for volunteers may exceed the supply. See Wash. Rev. Code Ann. § 13.34.100(2) ("If the court does not have available to it a guardian ad litem program with a sufficient number of volunteers, the court may appoint a suitable person to act as guardian ad litem for the child under this chapter.").
[7] See In re Amendments to Rules Regulating the Florida Bar, 598 So.2d 41, 55 (Fla. 1992) (Kogan, J., dissenting) (guardian ad litem program supports need for mandatory pro bono).