865 So.2d 8 (2003)
P.M., Father of P.M., A Child, Appellant,
v.
DEPARTMENT OF CHILDREN AND FAMILIES, Appellee.
No. 5D02-3569.
District Court of Appeal of Florida, Fifth District.
December 19, 2003.
Rehearing Denied February 11, 2004.
*9 Dean G. Pepe of Pappas, Russell & Pepe, Daytona Beach, for Appellant.
George P. Beckwith, Jr., Deputy District Legal Counsel and M. Celine, Cannon, Assistant District Legal Counsel, of Department of Children and Families, Daytona Beach, for Appellee.
SHARP, W., J.
P.M. appeals from an amended order of dependency adjudication/disposition which adjudicated his infant daughter P.M. dependent and placed the child in the temporary custody of the Department of Children and Families. Because of a number of errors and inconsistencies in the proceedings below, we remand to the circuit court to clarify whether or not it found the child dependent as to P.M.; and if not, the Department should have the discretion to *10 refile such petition based on the information and findings of Judge Piggotte, at the subsequent hearing regarding custody of the child.
The facts in this case suggest to us the child is at serious risk of being abused by P.M. and so we recite them in some detail. P.M. is not the biological father of the child. However, he is the child's "legal" father since the child was born during his marriage to the child's mother. Department of Health and Rehabilitative Services v. Privette, 617 So.2d 305 (Fla.1993)
The parties were married in 1999 in the Fiji Islands. At the time, the mother was eighteen and P.M. was forty-two years old. P.M. returned by himself to the United States because the mother, a citizen of the Fiji Islands, had visa problems. She arrived here fifteen months later pregnant by another man.
The child was born in August 2000. By March 2002, the mother left P.M. taking the child with her. P.M. did not provide any financial support for the child.
The Department took the child into shelter care in July 2002. According to the shelter petition, P.M. had sexually abused the child and been violent toward the mother and the mother failed to protect the child from the abuse.
The following month, the Department filed a petition alleging the child was dependant as to both P.M. and the mother. The Department alleged in part the child was abused or at risk of being abused because P.M. had fondled the child, allowed the child to touch his genitals, was violent towards the mother (the acts of violence included rape), and the mother failed to protect the child from this abuse.
The adjudicatory hearing was held on September 19, 2002 before Judge Vernon Mize. The mother filed a written consent to dependency in open court so the hearing involved only the dependency status of the child as to P.M.
Vickie Brandenburg, a nurse practitioner for the Department, examined the child in May 2002 after the case was referred to her for alleged sexual abuse by P.M. The medical findings were normal for the then twenty-one month old child.
Brandenburg explained she would not expect any diagnostic findings since the allegations did not involve penetration. Thus her findings neither confirmed nor ruled out sexual abuse. Brandenburg conferred with the case coordinator and both agreed the child's risk for future abuse would be high based on the allegations. They recommended no contact between the child and P.M., and that the mother receive domestic abuse counseling.
Police Officer Coomans received a report of domestic violence and sexual abuse in December 2001. The mother reported P.M. and the child had just gotten out of the shower, they did not have on any clothes and she witnessed the child repeatedly touch P.M.'s penis.
The mother also reported she had been physically handled by P.M. P.M. admitted to Coomans these allegations were true.
Police Officer Traylor investigated a report of possible sexual abuse by P.M. in May 2002. Traylor contacted the Department's investigator, who stated there were indicators P.M. had possibly been exposing himself to the child. Traylor spoke with the mother, who said she had seen P.M. undressed in front of the child and the child touching P.M. in a lewd manner on a number of occasions.
Traylor contacted P.M. and he consented to a taped interview. During the taped interview, P.M. admitted he had been unclothed in a bathing situation and also in the living room. P.M. wanted to have his daughter explore his body. P.M. said this *11 happened about five times. Traylor said "he told me it was a bonding thing between him and his child and that it was something that made the child feel closer to him and that he said that he just wanted his child to explore the body." P.M. also complained about a lack of sexual contact with the mother.
Eileen Copeland, a family support worker for the Easter Seals Healthy Family Program, visited the parties' home on a weekly basis. Copeland felt P.M. was trying to interfere with the mother's plan to become self-sufficient. For example, Copeland developed a plan for the mother to get her GED. P.M. told the mother that if she failed the test, she would be deported.
P.M. was always present with them and Copeland felt he was monitoring her contact with the mother. The mother told her there was physical abuse in the home. One time, the mother left the home and asked Copeland for the number for a domestic abuse shelter.
Christina Vestal, a child protective investigator for the Department, conducted a criminal background check on P.M. P.M. has an arrest record dating from 1983 for offenses including homicide, theft, and possession of a short barrel shotgun. An injunction against repeat domestic violence was on file against P.M. and he was prohibited from purchasing a firearm.
The mother testified when the parties were first married, P.M. tied her up and had sex with her. After she came to the United States, he no longer tied her up. On several occasions, he put a dog leash on her neck and told her to bark like a dog.
Several months after the child was born, the mother went to work and P.M. became physically abusive. He hit, kicked, shoved and tried to choke her. In February 2002, he tried to rape her. The mother obtained a two year restraining order against him.
On one occasion in November 2001, P.M. was on the couch watching TV. Both he and the child were naked. He picked the child up and put her on his lap. Suddenly the mother saw the child was playing with his private part. When she asked P.M. about this, he said the baby was exploring herself.
Sometimes when the mother had to work, she asked P.M. to bathe the child. On one occasion in January 2002, P.M. was giving the child a bath and the child was playing with his private part. The mother watched them doing this for about five minutes. P.M. did not try to stop the child until he noticed the mother was watching them. Then he told the child not to do that. The mother reported the incident to police.
P.M. threatened that if the mother left him, he would try to get her deported. He told her that if she failed her GED, she would be deported. P.M. also used his criminal background to frighten her. He told her he shot a person in 1989 and has a gun buried somewhere.
P.M. admitted he physically abused the mother. P.M. shoved the mother away from him when she was slapping him and twisted her arm and put it in an arm lock to prevent her from pinching and slapping him. P.M. also admitted a report had been made by the county health facility when the mother went for a physical examination and they noticed bruises on her body.
P.M. admitted the child was in the house when he had these physical altercations with the mother. On one occasion, he was arguing with the mother in front of the child, the child started crying and the mother called the police.
*12 P.M. admitted he "encouraged" the mother to have sex with him. When asked whether he ever had sex with the mother against her will, P.M. replied he tried one time about two or three weeks before she left. P.M. wanted sex and the mother was unresponsive and started calling him names. P.M. became angry, called her names and the two started wrestling. Finally, P.M. became so angry that he stood up with the mother on his lap. He then dropped her on the floor and walked out the room. This was the only time P.M. would have considered raping the mother and blamed her for deliberately making him so angry.
P.M. denied threatening to have the mother deported, but did admit he warned her on occasions that certain actions of hers could be viewed by INS as a basis to deport her. P.M. admitted he has not provided any financial support since the mother left him.
P.M. admitted there were times he would undress himself and the child to bathe her. If the bath was not ready, P.M. and the child would sit on the couch and watch television for a few minutes. The child touched him spontaneously and he told her no, that was not for little babies. This happened three or four times.
P.M. uses his bare handsnot a washclothto wash himself and the child. He lathers up his hands, washes the child and then rinses her off. They bathe practically every day like this. The child has touched his genital area "three times, four times, less than half a dozen."
Despite P.M.'s admissions and the testimony corroborating the Department's allegations, the transcript reflects that Judge Mize found this evidence was insufficient to find the child dependent as to P.M. and ordered the child returned to him. However, no written order was entered at this time.
Five days later, the mother moved to change custody from P.M. to herself or to the Department. The mother alleged the child was in danger of being sexually abused if she were to remain in P.M.'s care. The mother also moved for unsupervised visitation with the child. A hearing was held on these motions on October 14, 2002 before Judge Julianne Piggotte.
Christina Vestal, the Department's child protective investigator, testified that since the child has been returned to P.M., additional abuse reports have been called in. On September 23rd, the Department received a report stating that in the past, the child had been sexually abused by P.M. There were also concerns about a lack of money and food in P.M.'s home. P.M. was not working and was selling blood for income. Vestal understood that P.M. had been taking the child with him to the blood bank. She found very little food in the home.
On October 7th, Vestal received a report the child had been sexually abused by P.M. The child was taken for an examination and slept through the entire examination. The child weighed 23 pounds, 11 ounces, which is borderline in the 10th percentile for her age. Vestal was told this means the child is underweight.
Vestal learned P.M. has a roommate, who also has a criminal background. P.M. admitted neither he nor his roommate was working.
Eileen Copeland, the Easter Seals family support worker, testified the reasons for the child's removal from the mother have now been resolved. The mother has sufficient food and clothing for the child and the home is a safe environment for the child. Copeland has concerns about the child remaining with P.M. because of his *13 admissions of what he has done to the child and not providing food for her.
After the adjudicatory hearing, Copeland saw P.M. take the baby to the restroom to change her diaper. When he returned, he sat the child in her mother's lap. The child pulled up her dress and said "pee pee" and pointed with her finger to her diaper.
Mattie Carter, a family advocate with the Children's Advocacy Center, was also concerned about the current placement of the child with P.M. Carter was present when the child was pointing to her genital area and was concerned because the child continued to indicate a problem with her body. Carter was at the Human Services Office and overheard P.M. say he did not have the money to pay his mortgage, he did not have food in the home and was selling his blood. She was concerned P.M. was taking the child to these places.
The mother testified P.M. told her he was going to take the child and move to Georgia. When she went to P.M.'s home, she peeked through the window and saw that he was naked in the bathtub with the child.
When asked about the claim the mother saw him and the child naked in the bathtub, P.M. said it was impossible because one could not see directly from the bedroom window into the bathtub. However, P.M. admitted he was bathing with the child apparently with the lights off:
[The mother] saw we were wet because I answered the door. Someone was banging on the door. I was getting ready to take the child to go out for the day. We were bathing. And while we were in the tub, bam bam bam. So I opened the door and [The mother] insisted on opening the door wide and turning the light on.
The guardian ad litem recommended the child not be placed in P.M.'s custody. She also recommended P.M. undergo a psychosexual evaluation.
At the conclusion of the hearing, Judge Piggotte expressed her serious concern about the well-being of the child if she remained in P.M.'s custody. She concluded circumstances had arisen since the adjudicatory hearing that concerned her about placing the child with P.M., even though the child had been found not dependant as to him. Judge Piggotte believed the mother had not yet demonstrated sufficient stability or maturity to protect the child and placed the child in foster care.
Judge Piggotte ordered both parties to complete parenting classes and a domestic violence assessment, maintain adequate and stable housing and income, pay child support, and refrain from illegal activity that effects their ability to effectively parent the child or places the child at risk of abuse. Judge Piggotte also ordered play therapy for the child and required P.M. to participate in a psychosexual evaluation with a polygraph. Contact between the parents and child was to be supervised.
Judge Piggotte asked the Department to develop a case plan. She also asked counsel for the Department to draft the disposition order.
Counsel for the Department apparently drafted the order of dependency adjudication/disposition which adjudicated the child dependent and placed her in the temporary custody of the Department. The order found the child was dependent as to the mother based on neglect and/or prospective neglect. The order also found the child was dependant as to P.M. based on abuse and/or prospective abuse.
Following Judge Piggotte's directives, the order required the mother to participate *14 in parenting classes and domestic violence counseling for victims, maintain suitable housing, and obtain employment. The order required P.M. to complete parenting classes and domestic violence counseling for batterers, obtain suitable housing and employment, and successfully complete a psychosexual examination which includes a polygraph test. Judge Piggotte signed this order, even though she acknowledged Judge Mize had found the child was not dependant as to P.M.
A case plan hearing was held a few days later before Judge Mize. The Department now filed a case plan which had the goal of reuniting the child with the mother. Judge Mize approved the case plan, subject to objections by the guardian or attorneys for the parties. The case plan requires P.M. to complete a number of tasks before he can be reunited with the child.
Counsel for the Department also submitted an amended order of dependency adjudication/disposition, which corrected a minor error in the caption of the order and was otherwise the same as the prior order. Judge Mize signed the amended order, which again we note provides the child is dependent as to P.M.
On appeal, P.M. argues the portions of the amended order finding the child dependent as to him and transferring custody to the Department must be reversed and the child immediately returned to him. We acknowledge the findings of abuse by the father set forth in the order do not comport with Judge Mize's oral pronouncement from the adjudicatory hearing. Ordinarily we would remand for a corrected order. See Y.G. v. Department of Children and Families, 830 So.2d 212 (Fla. 5th DCA 2002) (remand was necessary to correct dependency order so that it conformed with oral pronouncement that basis for dependency was prospective neglect, not abuse as stated in the order).
However, we decline to do so because of the serious nature of the allegations against P.M. (admitted in large part by P.M.) and the confusion generated by the fact the order and amended order which found the child dependent as to P.M. were signed by both judges who presided over this matter. Judge Mize also approved the case plansubject to objections by the partieswhich requires P.M. to complete a number of tasks before he could be reunited with the child. This suggests to us that Judge Mize may have changed his mind regarding the legal effect of the evidence and determined the child was in fact dependent as to P.M.
To adjudicate a child dependent, the trial court must find the child has been abused, abandoned, or neglected or is at substantial risk of imminent abuse, abandonment, or neglect only by a preponderance of the evidence. § 39.507(1)(b), Fla. Stat.; M.N. v. Department of Children and Families, 826 So.2d 445 (Fla. 5th DCA 2002). For the most part, P.M. admitted the facts which formed the basis for the allegations of domestic violence. He simply minimized their impact or attempted to shift the blame to the mother. He even acknowledged the child was in the house during their altercations and that on at least one occasion, the child became upset by their arguments and the police were called.
P.M. also admitted the facts which formed the basis for the allegations of sexual abuse. Under section 39.01(63), "sexual abuse of a child" includes the following:
(b) Any sexual contact between the genitals or anal opening of one person and the mouth or tongue of another person.
* * *
(d) The intentional touching of the genitals or intimate parts, including the *15 breasts, genital area, groin, inner thighs, and buttocks, or the clothing covering them, of either the child or the perpetrator, except that this does not include:
1. Any act which may reasonably be construed to be a normal caregiver responsibility, any interaction with, or affection for a child; or
2. Any act intended for a valid medical purpose.
* * *
(f) The intentional exposure of the perpetrator's genitals in the presence of a child, or any other sexual act intentionally perpetrated in the presence of a child, if such exposure or sexual act is for the purpose of sexual arousal or gratification, aggression, degradation, or other similar purpose.
P.M.'s activities with the child involve much more than a parent bathing a child. P.M. was touching the child apparently every day with his hands and allowed the child to touch his genitals on numerous occasions. In P.M.'s own words, he wanted his daughter to "explore" his body and he considered this to be a "bonding" experience. These activities were occurring at a time when P.M. admitted a lack of sexual contact with the mother. P.M.'s admissions to police and at the adjudicatory hearing signal to us the child has been abused or is at substantial risk of imminent abuse if left in the unsupervised care of P.M.
However, even if the child has not been found dependant as to P.M., a "non-offending" parent is not automatically entitled to the immediate unconditional custody of the child. Section 39.521(3)(b) requires the court to place a child adjudicated to be dependent as to one parent with the child's remaining non-residential parent if that parent so requests "upon completion of a home study unless the court finds that placement would endanger the child."[1]M.M. v. Department of Children and Families, 777 So.2d 1209 (Fla. 5th DCA 2001).
In this case, Judge Piggotte clearly concluded that placement with P.M. would endanger the safety, well-being, or physical, mental, or emotional health of the child. Furthermore, the record is unclear as to whether a home study of P.M. had been completed. See B.W. v. Department of Children and Family Services, 842 So.2d 1000 (Fla. 3d DCA 2003)(in proceeding adjudicating child dependent as to mother, trial court's order terminating county's jurisdiction over child and placing child in father's care were premature, where the court placed the child with the father without requiring the Department to complete and file a home study on the father as dictated by statute).
Despite the parent's status as "non-offending," circuit courts have the authority to impose requirements upon that parent or custodian. In J.P. v. Department of Children and Families, 855 So.2d 175 (Fla. 5th DCA 2003), we recently held the father could be ordered to submit to a *16 psychological evaluation as part of a case plan even though the child had not been adjudicated dependent as to the father. In that case, the Department filed a petition for dependency as to both of the child's parents. After conducting a hearing, the circuit court adjudicated the child dependent as to the mother, but found the Department had failed to sustain its burden of proving the child was dependent as to the father. However, the court reserved ruling on the issue of placement of the child pending a positive home study of the father.
At the subsequent disposition hearing, the court was advised by the father's counsel that the father was not prepared to take custody of the child since he had no stable home or employment, but counsel argued the father should not be required to participate in a case plan since he was found to have been a non-offending parent. The court ruled the father would be required as part of a case plan to submit to a psychological examination and then comply with any recommendations made by the evaluator.
The father appealed, arguing the circuit court erred in ordering him to participate in a psychological examination since he was found to be non-offending. We disagreed, noting that section 39.407(14) specifically authorizes trial courts to order mental health examinations in dependency matters upon a showing that the parent's mental condition is in controversy and good cause exists to require an examination.[2] We also relied on section 39.521(1)(b)1. which authorizes the court to require the parent and, when appropriate, the legal custodian, to participate in treatment and services deemed necessary to ensure the well-being of the child.[3]
While these provisions specifically authorize certain actions by the circuit courts in their role as guardians of the rights of children, courts are not confined to the express provisions of chapter 39 in providing for the safety and welfare of children. Circuit courts have inherent and continuing jurisdiction to protect children and that jurisdiction is not dependent on a chapter 39 action. See Bilbo v. Bilbo, 688 So.2d 1031 (Fla. 5th DCA 1997) (circuit court has inherent jurisdiction to control the welfare and act for the protection of minors within its territorial jurisdiction); Waters v. Waters, 578 So.2d 874 (Fla. 2d DCA 1991) (circuit court has inherent jurisdiction over minor children as to their custody and welfare; jurisdiction is not dependent on case having originated in either a chapter 61 or chapter 39 action or under any other statute); In interest of J.M., 499 So.2d 929 (Fla. 1st DCA 1986) (circuit court has inherent and continuing jurisdiction to entertain matters pertaining to child custody and enter any order appropriate to a child's welfare).
*17 Accordingly, we affirm the portion of the order placing the child in the custody of the Department based on section 39.521(3)(b) as apparently no home study as to P.M. was conducted and Judge Piggotte found placing the child with P.M. would endanger her well-being. We remand for clarification of Judge Mize's finding regarding dependency of the child as to P.M. If the child was found dependent as to P.M., then the order shall remain in effect in its entirety. If the child was not found dependent as to P.M., the requirements that P.M. undergo a psychosexual evaluation and attend parenting classes and domestic violence counseling are nevertheless affirmed pursuant to sections 39.407(14) and 39.521(1)(b)1. However, the remaining portions of the order inconsistent with the finding of no dependency as to P.M. must be stricken. In that event, the Department is urged to consider refiling a dependency petition as to P.M.
AFFIRMED in part; REMANDED for further proceedings consistent with this opinion.
PETERSON and GRIFFIN, JJ., concur.
NOTES
[1] § 39.521. Disposition hearings; powers of disposition

(3) When any child is adjudicated by a court to be dependent, the court shall determine the appropriate placement for the child as follows:
* * *
(b) If there is a parent with whom the child was not residing at the time the events or conditions arose that brought the child within the jurisdiction of the court who desires to assume custody of the child, the court shall place the child with that parent upon completion of a home study, unless the court finds that such placement would endanger the safety, well-being, or physical, mental, or emotional health of the child....
[2] § 39.407. Medical, psychiatric, and psychological examination and treatment of child; physical or mental examination of parent or person requesting custody of child

* * *
(14) At any time after the filing of a shelter petition or petition for dependency, when the mental or physical condition, including the blood group, of a parent, caregiver, legal custodian, or other person requesting custody of a child is in controversy, the court may order the person to submit to a physical or mental examination by a qualified professional....
[3] § 39.521. Disposition hearings; powers of disposition

(1) (b) When any child is adjudicated by a court to be dependent, the court having jurisdiction of the child has the power by order to:
1. Require the parent and, when appropriate, the legal custodian and the child, to participate in treatment and services identified as necessary.