A.D.A., the mother and M.J.L., the father, Appellants,

v.

D.M.F., the husband, Appellee.

Nos. 4D15–575, 4D15–874.

District Court of Appeal of Florida, Fourth District.

Sept. 7, 2016.

A.D.A., the mother, Royal Palm Beach, pro se.

M.J.L., the father, Royal Palm Beach, pro se.

Andrew A. Harris of Burlington & Rockenbach, P.A., West Palm Beach, and J. Mark Maynor of Maynor & Associates, West Palm Beach, for appellee.

## ON MOTION FOR REHEARING AND CLARIFICATION

GROSS, J.

There are three actors in this unusual case, which challenges the ability of the law to do the right thing—the child's mother (A.D.A.), the mother's husband (D.M.F.), and the mother's former boyfriend/child's biological father (M.J.L.).

We grant the husband's motion for rehearing or clarification and withdraw the opinion issued June 8, 2016, which reversed the trial court's denial of the boyfriend's motion for paternity testing. We substitute the following.

Our original opinion focused on whether the husband committed fraud when filing an Acknowledgement of Paternity. However, as the husband correctly pointed out in the motion for rehearing, the trial court never made a finding of fraud. Under the applicable statute, the husband can only prevail in this case if, in filing an Acknowledgment of Paternity, he did not commit fraud or there was no "material mistake in fact." § 742.10(4), Fla. Stat. (2010).

We reverse and remand to the trial court for a hearing to determine if the husband's Acknowledgment of Paternity affidavit was "obtained through fraud, under duress, or that there was a material mistake in fact." If the affidavit was fraudulent, deciding this case against the rights of the biological father would be to condone an attempt to sidestep the adoption statute. If the Acknowledgement was neither fraudulent nor obtained as a result of a material mistake of fact, the husband was the child's legal father and the trial court rightly denied the boyfriend's motion for paternity testing.

### Facts

The mother and boyfriend had a romantic relationship that ended in late 2009, because she was "in trouble with the law." On December 22, 2009, the mother had a baby girl; she listed no father on the birth certificate. Although not yet married to the mother, the husband was present at the child's birth; the boyfriend also came to the hospital the day of the birth.

In January 2010, the boyfriend filed a petition to determine paternity and related relief. The petition alleged that there was the "requisite sexual contact" between the mother and the boyfriend to make it a "reasonable possibility" that the boyfriend was the baby's father. § 742.12(2), Fla. Stat. (2010). The boyfriend claimed he and the mother had an intimate relationship during a time frame consistent with his paternity, but that the mother would not let him see the child. The boyfriend's affidavit stated he had no income and $50 in assets.

On February 19, 2010, the boyfriend filed a claim of paternity with the Florida Putative Father Registry. According to section 63.054(1), Florida Statutes (2010), one legal effect of this filing was that it "preserve[d] the [boyfriend's] right to no-tice and consent to an adoption" under Chapter 63, Florida Statutes.

The boyfriend filed a voluntary dismissal of his paternity action in July 2010.

Two weeks later, the mother and husband filed an Acknowledgment of Paternity affidavit, listing the *husband* as the "natural father" of the child. As described in section 742.10(1), Florida Statutes (2010), this Acknowledgement was a "notarized voluntary acknowledgment of paternity." In pertinent part, the "Acknowledgement by Natural Parents" stated:

> Under penalties of perjury, **WE HEREBY DECLARE** that we have read the foregoing Acknowledgement of Paternity and that the facts stated in it are true, that is, that the mother was unwed at the time of birth, that no other man is listed on the birth record as father, that we are the natural parents of the child named above and that we fully understand our responsibilities and rights printed on the reverse side of this form ... We understand that a person who knowingly makes a false declaration pursuant to s. 92.525(2) or 382.026(1), Florida Statutes is guilty of perjury by false written declaration, a felony of the third degree....

In no uncertain terms, the reverse side of the form explained that by executing the acknowledgement, the parties to it were swearing that "they are the natural parents" of the child and that the husband was "agreeing that [he was] the biological father of the child." The form warned: "Do not sign the ACKNOWLEDGEMENT OF PATERNITY if you are not certain you are the child's father." The form cautioned that once the form was executed, "paternity can only be challenged by proving in court that [the father's] signature on the [Acknowledgement] was obtained through fraud, under

duress, or that there was a material mistake in fact."

The mother and husband were married on August 2, 2010. They separated in July 2011, when the mother left the marital residence.

The husband filed for dissolution of marriage on October 24, 2013. His petition alleged that a minor child was "born of the marriage of the parties" and requested 50/50 timesharing and a parenting plan. Little did he know, trouble was brewing— the mother had filed a complaint with the Department of Children and Families about the husband's behavior with the child; the husband said the allegations were false. The allegations remained pending throughout this litigation.

In November 2013, the boyfriend refiled a paternity petition. In that case, the mother and boyfriend, now apparently reconciled, filed a joint motion for scientific testing to determine parentage; both acknowledged the possibility that the boyfriend was the baby's father, but they were uncertain. The boyfriend was incarcerated at the time the motion was filed.

A circuit judge granted the motion for paternity testing, observing that the mother was not married to another at the time of the child's conception or birth. The paternity test results were filed with the court a month later. The test determined that the boyfriend could not be excluded as the baby's father and the probability of paternity was 99.9999%. The mother and the boyfriend filed an agreed parenting plan.

The husband moved to set aside the paternity testing, claiming that he was the child's legal father and the paternity suit was refiled without notice to him. He also moved to consolidate the paternity case with the divorce action. The circuit judge granted both of the husband's motions,

consolidating the cases and striking the DNA results, which were declared null and void. A *Privette* evidentiary hearing was set prior to the scheduled final hearing on paternity. *See Dep't of Health & Rehab. Servs. v. Privette,* 617 So.2d 305 (Fla.1993).

As required for a *Privette* hearing, the circuit court appointed a guardian ad litem ("GAL") for the child in the paternity action. The GAL's report concluded that it was in the child's best interest to have the DNA testing done to determine paternity. Relevant to this conclusion was the prior testing, which had confirmed the boyfriend as the child's father. The report stated that initially, the child had bonded with the husband and had called him "Daddy." However, by the time of the report, the husband had not had recent contact with the child due to the mother's abuse allegations. The mother had rekindled her relationship with the boyfriend and had been taking the child to visit him in prison. As a result, the child now called the boyfriend "Daddy."

With candor, the report noted that none of the parties had "shown the capacity to routinely and consistently make good judgments about themselves or others, so as to give the GAL confidence that the decision as to the DNA testing, whichever way it went, would result in a stable, safe, and healthy life for the child." Under these circumstances, the GAL "opted for the truth," suggesting the child had the right to know the truth about her parentage. The reintroduction of the husband into the child's life "could at this point do more harm than good" and there was no hope of a positive and healthy relationship between the husband and mother "upon which to build a foundation for family stability."

At the January 2015 *Privette* hearing, the boyfriend appeared by phone from prison; the boyfriend, mother, and the GAL were aligned together against the

husband and his family. We briefly summarize the testimony as to each side.

The boyfriend asserted he had supported the mother during the first eight months of her pregnancy. For three months after the birth, the boyfriend testified he made child support payments, which the mother did not deny. After the boyfriend moved to Brevard County for a better job, the mother frustrated his access to the child by cutting off contact with him for two years, from 2010 to 2012. Subsequently, the boyfriend and mother revived their relationship. The mother brought the child to the prison to visit, where the child and the boyfriend bonded. After release from prison, the boyfriend and mother planned to live together in a place where he had lined up a good job.

The GAL's testimony expanded on the findings in her report. She conceded that the husband loved the child and had been held out as the father during the first three years of the child's life, and it was the mother's conduct and her allegations of abuse that had prevented the husband from seeing the child.

The husband pointed to the boyfriend's 15–20 prior arrests, with his current incarceration being his fourth time in prison, questioning the boyfriend's stability. In contrast, the husband had a steady job at which he earned a good salary. The husband's father and stepmother testified that the husband had been a "doting father" who brought the child to many family gatherings. Until the divorce proceedings, neither had known that the husband was not the child's biological father.

In his opening statement the husband claimed he did not know whether he was the child's biological father. However, during the husband's testimony, he never expressly stated that he and the mother had intercourse at a time that could have made his paternity a possibility. One view

of the testimony is that the husband and mother did not rekindle their on-again, off-again relationship until late 2009 when the mother was "giantly pregnant" and facing legal trouble. After the mother was arrested and jailed, the husband posted her bail and was present at the hospital when the child was born.

Some months later, the husband joined with the mother in filing an Acknowledgement of Paternity and the two married and lived together for a year. During that time, the husband provided significant financial support and bonded with the child, who called him "Daddy." He attended doctor's visits and paid for Montessori school. The mother's conduct and her abuse allegations had kept him from seeing the child for several years.

After the hearing, the judge denied the motion for paternity testing, concluding that it was not in the child's best interests, which is the standard required by *Privette*. The court ordered the husband and the mother to "immediately begin reunification counselling so that the child and [the husband] can begin to re-establish their father-daughter relationship."

### Discussion

Chapter 742, Florida Statutes (2014), is entitled "Determination of Parentage." Section 742.10(1) provides that, for a child born out of wedlock, where two parties file a "voluntary acknowledgement of paternity," such "acknowledgement constitutes the establishment of paternity for purposes of this chapter." The acknowledgement creates a "rebuttable presumption" of paternity, subject to the right of "any signatory to rescind the acknowledgement within 60 days after the date the acknowledgement was signed or the date of an administrative or judicial proceeding relating to the child, . . . whichever is earlier." *Id.*

A voluntary acknowledgement constitutes an establishment of paternity that can only be challenged in court "on the basis of fraud, duress, or material mistake of fact, with the burden of proof upon the challenger." § 742.10(4); *see also J.A.I. v. B.R.*, 160 So.3d 473, 474 (Fla. 2d DCA 2015) (finding that where the man who signed the acknowledgement of paternity was aware another man could be the child's biological father the acknowledgement was not based on a material mistake of fact).

Clearly, the section 742.10(1) presumption should not apply if the Acknowledgment of Paternity was fraudulent. Such fraud would have occurred if the husband had no good faith basis for believing he was the biological father of the child. A presumption of paternity cannot rest on a false affidavit.

Section 742.091 provides that if the "mother of any child born out of wedlock and the *reputed* father shall at any time after its birth intermarry, the child shall in all respects be deemed and held to be the child of the husband and wife, as though born within wedlock." § 742.091, Fla. Stat. (2014) (emphasis added). The term "reputed father," as used in section 742.091, "can be interpreted to mean the individual generally or widely believed or considered to be the biological father of a particular child." *A.S. v. S.F.*, 4 So.3d 774, 776 (Fla. 5th DCA 2009).

Here, the boyfriend's filing with the Florida Putative Father Registry preserved his rights to notice and consent to an adoption. If the husband's Acknowledgement of Paternity was fraudulent, coupled with the subsequent marriage to the mother, the legal effect of conferring paternity status on the husband would allow a bypass of the entire Chapter 63 adoption process.

The hearing below focused on whether a paternity test was in the best interest of the child. Therefore, the parties were not afforded the opportunity to litigate the circumstances surrounding the filing of the Acknowledgement of Paternity. Because the trial court did not make an express finding that the husband's Acknowledgement was fraudulent or the product of a material mistake in fact, we withdraw our prior opinion and remand for the trial court to hold a hearing on this issue.

If the Acknowledgment was fraudulent, there would be no section 742.10(1) presumption of paternity. Further, if, at the time of the marriage, both the mother and the husband knew he could not have been the child's biological father, then he could not be the "reputed" father within the meaning of section 742.091. Thus, the child would not be "deemed" the child of the husband, "as though born within wedlock."

In such a circumstance, the husband would not be the legal father and the case is not controlled by *Department of Health and Rehabilitative Services v. Privette. See also Daniel v. Daniel*, 695 So.2d 1253, 1255 (Fla.1997) (limiting *Privette* to "those instances where a child faces the threat of being declared illegitimate, and the 'legal father' also faces the threat of losing parental rights which he seeks to maintain."). *Privette* concerned the legitimacy of a child born *into* a marriage and acknowledged that a "child's legally recognized father . . . has an unmistakable interest in maintaining the relationship with his child unimpugned." 617 So.2d at 307 (citing *Santosky v. Kramer*, 455 U.S. 745, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982)).

If the trial court finds that the husband's Acknowledgement was fraudulent, then the test fashioned in *Privette* would not apply because it was undisputed that the mother was unmarried when the child was born. Thus, the requirement imposed on the boyfriend seeking a paternity test to prove by "clear and convincing evi-

dence" that "the child's best interests will be better served" by the paternity test would be incorrect. *Privette*, 617 So.2d at 308.

At the prior hearing, the boyfriend demonstrated more than a "reasonable possibility of the requisite sexual contact" with the mother to justify a paternity test. § 742.12(2). If the trial court finds that the basis for the husband's Acknowledgement of Paternity was fraudulent, then on remand, the court shall accept the results of the paternity test previously conducted.

On the other hand, if the trial court finds the husband had a good faith belief that he was the child's natural father, then the second district's reasoning in *J.A.I. v. B.R.*, 160 So.3d 473 (Fla. 2d DCA 2015), should control. In that case, a man filed an acknowledgement of paternity pursuant to section 742.10(1), apparently with a good faith belief that it was possible he was the father of a child born out of wedlock. *Id.* at 474. Based on such a good faith filing of the acknowledgment, plus the marriage of the man and the mother prior to the filing of a second man's paternity action, the second district concluded that the second man was precluded from challenging the paternity of the child. *Id.* at 475.

Here, if the husband had a good faith belief he was the biological father, then the boyfriend was precluded from challenging paternity and the motion for paternity testing was correctly denied.

We also note that at the prior hearing the mother was erroneously precluded from challenging the husband's paternity based on this court's decision in *Flores v. Sanchez*, 137 So.3d 1104 (Fla. 4th DCA 2014). In *Flores*, the mother named on the birth certificate a man she knew was not the child's biological father. *Id.* at 1106. The mother later challenged paternity, asserting she had never had an intimate relationship with the man listed on the birth certificate. *Id.* at 1107. The court found that under these circumstances, the mother was estopped from challenging the validity of the acknowledgement of paternity because she was complicit in any alleged fraud. *Id.* at 1109–10 (citing both *Allison v. Medlock*, 983 So.2d 789, 790 (Fla. 4th DCA 2008) and *Van Weelde v. Van Weelde*, 110 So.3d 918, 922 (Fla. 2d DCA 2013)).

In this case, unlike in *Flores*, paternity is being challenged by the boyfriend, not the mother. Therefore, on remand, the mother should not be prevented from making arguments supporting the boyfriend's petition or challenging the husband's Acknowledgment of Paternity.

We understand the trial judge was well-intentioned in his conclusions that the husband and his family had the best interest of the child at heart, contrary to the poor choices demonstrated by the mother's conduct. However, if the Acknowledgment of Paternity was fraudulent, the applicable statutes do not authorize the elimination of the biological father's rights under the circumstances of this case. We agree with the observation of the second district that difficult cases such as this one "present major public policy issues that are difficult, if not impossible, to address within the case law method." *Dep't of Revenue ex. rel Preston v. Cummings*, 871 So.2d 1055, 1061 (Fla. 2d DCA 2004), *approved*, 930 So.2d 604 (Fla.2006). Unfortunately, the mother in this case has placed her child in a difficult situation beyond the ability of a court to ameliorate.

*Reversed and remanded for further proceedings consistent with this opinion.*

DAMOORGIAN and KLINGENSMITH, JJ., concur.